# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | |
|---|---|
| **BUNCOMBE COUNTY, NORTH CAROLINA, individually and on behalf of all those similarly situated,** | ) ) ) ) |
| **Plaintiff,** | ) ) |
| **v.** | ) ) |
| **TEAM HEALTH HOLDINGS, INC., AMERITEAM SERVICES, LLC, and HCFS HEALTH CARE FINANCIAL SERVICES, LLC,** | ) ) ) ) ) |
| **Defendants.** | ) ) |

---

## CLASS ACTION COMPLAINT

Plaintiff, Buncombe County, North Carolina (the "County"), files this Complaint against Defendants, Team Health Holdings, Inc. ("Team Health Holdings"), Ameriteam Services, LLC ("Ameriteam") and HCFS Health Care Financial Services, LLC ("HCFS") (collectively "TeamHealth"), and alleges and states as follows:

## I.     NATURE OF THE ACTION.

1.     The County is the duly authorized plan sponsor, plan administrator, and funder of the self-funded Buncombe County Government Group Health Plan (the "Buncombe County Plan" or "Plan"). The Plan provides health insurance benefits to numerous County workers and their families in the Western North Carolina region. The County pays TeamHealth's affiliates including Southeastern Emergency Physicians, PLLC ("SEP") and Emergency Coverage Corporation ("ECC") for emergency department ("ED") services provided to the Plan's members, and has been

1

and continues to be injured and monetarily damaged by Defendant's abusive and deceptive overbilling practices. During the pertinent times, Plaintiff has paid TeamHealth's inflated medical bills out of its own assets. Now, Plaintiff has confirmed systematic overcharges by the TeamHealth enterprise which staffs multiple EDs of hospitals in Western North Carolina. Accordingly, Plaintiff brings this action for unjust enrichment.[1]

2.     The County has obtained claims data allowing it to determine that it has been charged a hugely disproportionate volume of Current Procedural Terminology ("CPT")[2] code level 5 bills for ED services provided by the SEP and ECC TeamHealth affiliates operating in Western North Carolina. There is no reasonable explanation for this huge volume of level 5 coding except the TeamHealth fraudulent upcoding scheme described further below. TeamHealth has been unjustly enriched as a result of the scheme.

3.     This overbilling came as no accident, but rather was the fruit of a deliberate business model designed to actively conceal the overbilling from the payors. The scheme makes the overbilling ordinarily undetected because it is founded upon upcoding of CPT codes used to

---

[1] The County wrote TeamHealth on November 4, 2022 requesting copies of medical records supporting a sample set of TeamHealth's recent bills which the County has paid. On November 15, 2022, TeamHealth wrote back refusing to provide those records under the pretext that release is barred by the privacy regulations promulgated under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d *et seq*. In fact, TeamHealth is not barred from releasing de-identified records to the County, as it is well aware. TeamHealth is aware that without access to such records, the County is unable to perform the claim-by-claim expert analysis required to allege specific predicate acts for purposes of alleging with particularity a claim under the Racketeer Influenced and Corrupt Organizations ("RICO"), 18 U.S.C. § 1961 *et seq*. The County reserves the right to add such a claim once TeamHealth voluntarily or as compelled by Court Order releases the relevant records, to which the County is entitled and which are indistinguishable from records that TeamHealth has voluntarily or under Court Order released to other payors in the past including United Healthcare, Celtic Insurance and the Louisiana Municipal Risk Management Agency ("LMRMA").

[2] "CPT codes are developed, maintained, and copyrighted by the American Medical Association to help ensure uniformity among medical professionals and the health insurance industry. CPT codes consist of a group of numbers assigned to every task and service a medical practitioner may provide to a patient, including medical, surgical, and diagnostic services." *Witkin v. Bureau of Workers' Comp. Fee Review Hearing Office (State Workers' Ins. Fund)*, 67 A.3d 98, 99 n.4 (Pa. Commonwealth Ct. 2013).

bill for services, because TeamHealth uses a web of smaller affiliates like SEP and ECC to submit the bills, and because the amount in controversy in each discrete bill is relatively small.

4. Defendants have actively concealed the fraud by splitting up TeamHealth's numerous providers staffing hospitals across the nation into over 100 ostensibly separate and independent local practice entities. Each of these local entities is seemingly disconnected from the others and they go by many different names, none called TeamHealth. With regard to Plaintiff, the relevant local practice groups included SEP and ECC. While the medical professionals with SEP and ECC provide the services, the coding and billing is done by a single entity, believed to be[3] HCFS. Then, the bills for services rendered are sent under the local practice groups' names, not HCFS. This setup fragments and disguises the source of the overbilling.

5. The important services provided by the individual healthcare providers and medical professionals, including physicians, nurse practitioners ("NPs"), physician assistants ("PAs") and others are intended by those individuals to serve the public good, and those individuals may be unaware of the coding and billing fraud. Nonetheless, the integrity of the coding and billing for the services provided has been infiltrated and corrupted by the TeamHealth enterprise.

6. The TeamHealth ultimate parent entity, namely Team Health Holdings, claims that it does not interfere with the medical independence and discretion exercised by the physicians at the 100-plus local practice entities. Yet Defendants require that all of these local entities direct their billing and coding through a single bottleneck, HCFS, to facilitate false and fraudulent

---

[3] After the LMRMA sued TeamHealth in March 2022 in this Court (No. 3:22-cv-00104-DCLC-JEM) alleging overbilling and quoting excerpts from the HCFS website, that website was inexplicably deleted. However, as of October 25, 2022, TeamHealth still listed help-wanted postings on the TeamHealth corporate website seeking to hire coders to work in the "Coding Department" and provide "coding and documentation feedback" to the "HCFS Billing Center…."

coding. Defendants know that by separating the coding and billing from the medical practices, it can keep the individual physicians and other medical professionals in the dark. And, they know that by sending out the bills under the names of the many seemingly small, independent providers, it becomes much more difficult to identify the overbilling as a common flaw, or trace it back to TeamHealth as a common source.

7. It is now evident from other lawsuits,[4] including two before this Court,[5] that Defendants, via their enterprise, systematically overbilled payors for years. Accordingly, Plaintiff now brings this action to recover damages and disgorgement reflecting the wrongful medical overbilling and to seek declaratory and injunctive relief, on behalf of itself and a putative class of others similarly situated.

8. During the minimum three-year damages period for unjust enrichment,[6] in providing medical staffing to hospitals, TeamHealth has focused on ED staffing. TeamHealth promises hospitals and physicians that it will increase efficiency and profitability and lift the

---

[4] *See United States ex rel. Hernandez v. Team Fin., L.L.C.*, No. 2:16-CV-00432-JRG, 2020 U.S. Dist. LEXIS 26608, *31, 2020 WL 731446 (E.D. Tex. Feb. 13, 2020) (denying motion to dismiss relator's complaint filed under the False Claims Act, 31 U.S.C. § 3729 *et seq.* alleging upcoding and overbilling fraud); *Celtic Ins. Co. v. Team Health Holdings, Inc*., No. 3:20-cv-00523-DCLC-HBG (E.D. Tenn.) (see Doc. 1, complaint filed Dec. 10, 2020 ¶¶ 8-17 alleging *inter alia* systematic upcoding/overbilling); *Emergency Care Servs. of Pennsylvania v. UnitedHealth Group*, No. 5:20-cv-5094 (E.D. Pa.), *see* ECF No. 37 (counterclaim alleging that TeamHealth engaged in upcoding of health insurance claims); *United HealthCare Servs., Inc. v. Team Health Holdings, Inc*., No. 3:21-cv-00364 (E.D. Tenn.) (same, primary claim); *United States ex rel. Oughatiyan v. IPC the Hospitalist Co., Inc*., No. 09-C-5418, 2015 U.S. Dist. LEXIS 19066, 2015 WL 718345 (N.D. Ill. Feb. 17, 2015) (denying in part motion to dismiss FCA claim for TeamHealth hospitalist overbilling); *U.S. ex. rel. Mamalakis vs. Anesthetix Management LLC*, 2021 U.S. App. LEXIS 36193, 2021 WL 5818476 (Dec. 8, 2021) (involving TeamHealth anesthesiologist overbilling).

[5] *See Celtic Ins. Co., supra*; *United Healthcare Servs., Inc., supra*.

[6] For unjust enrichment, this Court has indicated that a three-year period applies. *United HealthCare Servs., Inc.*, 2022 U.S. Dist. LEXIS 84264, *15, 2022 WL 1481171 (E.D. Tenn. May 10, 2022) (three-year statute of limitations for unjust enrichment). However, Plaintiff alleges that tolling applies insofar as the Defendants made active efforts to conceal their misconduct. *See In re Estate of Davis,* 308 S.W.3d 832, 840-42 (Tenn. 2010) (discussing tolling); *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 463 (Tenn. 2012) (same). Plaintiff alleges that the extent of the misconduct did not become generally known until 2020 and therefore, the putative class period should be from 2017 to present.

administrative burdens off practitioners' shoulders. However, once HCFS becomes involved to do the billing, Defendants use their intentionally obfuscated scheme [7] in order to obtain overpayments from payors. Following uniform rules, policies, practices, and procedures, HCFS overbills by using improperly chosen CPT codes in conjunction with the billing. Plaintiff and other class members, either directly or through their third party administrators ("TPAs"), rely on TeamHealth's representations in the form of the CPT code-based billing statements that Defendants transmit across state lines by mail or wire and certify to be "true, accurate and complete."[8] In relying on Defendants' false representations and accepting claims for payment to their detriment, payors pay higher amounts than are properly due.

9.      Medical professionals generally bill ED services using consecutively numbered CPT codes from 99281 to 99285. Higher level codes indicate more extensive and complex treatment. The higher the level of the code, the greater the payment. Payors reimburse providers for higher CPT code services at a higher rate than for lower-coded services. Defendants overbilled by using inflated CPT codes not appropriate to the level of care provided. Defendants systematically engaged in upcoding, that is, specifying a higher code than was appropriate, and submitted fraudulent billing to Plaintiff and numerous other payors.

10.      During the pertinent times, Blue Cross Blue Shield of North Carolina ("Blue Cross") was an administrative services provider for the Plan, although the County remained both plan sponsor and plan administrator. Blue Cross used rules to determine amounts for the County to pay based on the CPT codes similar to those used by the Centers for Medicare and Medicaid

---

[7] *See Hernandez*, 2020 U.S. Dist. LEXIS 26608, *4-12 (summarizing analogous scheme); *Celtic Ins. Co.*, ECF No. 1, complaint filed Dec. 10, 2020, ¶¶ 8-17 (same).
[8] CMS Form 1500, see preprinted statements on reverse side of the hardcopy version. The electronic version is deemed to include the same.

Services ("CMS") to pay under the Medicare program. TeamHealth's scheme violated the CMS rules and those used by Plaintiff's Plan alike.

11.     TeamHealth advertises that HCFS coders work under rigorous standards, deliver impeccable service and are routinely audited.  TeamHealth represents to the public that it carefully calibrates its compliance criteria and that medical professionals and payors alike can trust the work performed by its coders.  These representations are false.

12.     TeamHealth perpetrated its schemes for the purpose of generating additional profit. The scheme defrauded the Plaintiff and similarly situated plans and payors cumulatively out of tens of millions of dollars over the statute of limitations period.

## II.     PARTIES.

### A.     Plaintiff.

13.     The Plaintiff County is organized under North Carolina law. N.C.G.S. § 153A-1 *et seq*. The County may sue and be sued. N.C.G.S. § 153A-11. To the extent North Carolina law grants standing for certain causes of action to "persons," such standing is also granted to the County. *See* N.C.G.S. § 12-3(6) ("persons" includes bodies politic and corporate). The County paid TeamHealth's bills for medical services directly out of its own funds and did not merely pass the bills through to some other payor.  Accordingly, the County has standing to bring this suit.

### B.     Defendants.

14.     Defendant Team Health Holdings is a Delaware corporation with its principal place of business at 265 Brookview Centre Way, Suite 400, Knoxville, Tennessee 37919. For jurisdictional purposes it is a citizen of Delaware and Tennessee.  It may be served with process at its corporate office address or c/o its registered agent, Corporation Service Company, 2908 Poston

6

Ave., Nashville, TN 37203-1312. Team Health Holdings is the ultimate parent company for the TeamHealth organization. Upon information and belief, Team Health Holdings was directly involved in promulgating and implementing the unlawful policies and practices alleged herein, and/or, is otherwise directly legally responsible for the conduct alleged herein, in addition to the responsibility shared by any other named Defendant.

15. Defendant Ameriteam is a Tennessee limited liability company. Its sole member is Team Finance LLC, whose sole member is Team Health Holdings. On information and belief, Ameriteam employs executive officers of TeamHealth, issues policies that govern all TeamHealth entities in conjunction with its ultimate parent, Team Health Holdings, and provides operational direction and administrative support to TeamHealth entities. Its principal place of business is at the 265 Brookview Centre Way address. Ameriteam is a citizen of Delaware and Tennessee. It may be served with process at its corporate office address or c/o its registered agent, Corporation Service Company, 2908 Poston Ave., Nashville, TN 37203-1312.

16. Defendant HCFS is a Florida limited liability company with a principal office situated in Knoxville, Tennessee. It may be served at its principal office address at 265 Brookview Centre Way, Suite 400, ATTN: Legal Dept., Knoxville, TN 37919-4049; or via its registered agent, Corporation Service Company, 2626 Glenwood Avenue, Suite 550, Raleigh NC 27608. On information and belief, the sole member of HCFS is Team Radiology, LLC, the sole member of Team Radiology, LLC is Team Finance LLC, and the sole member of Team Finance LLC is Team Health Holdings. HCFS provides or during pertinent times provided billing, coding, and collection services for the TeamHealth enterprise, as well as for others.

7

17.     Nonparty ECC is a business entity on information and belief formed and organized under Tennessee law. It is an emergency medicine provider. Its National Provider Identifier ("NPI")[9] Number is 1356379382. It has an office address at 1431 Centerpoint Drive, Suite 100, Knoxville TN 37932.  ECC is owned and controlled by Team Health Holdings.  ECC is one of the TeamHealth local practice entities that submitted claims for reimbursement to the Buncombe County Plan for ED services rendered by TeamHealth professionals.

18.     Nonparty SEP is a business entity on information and belief formed and organized under Tennessee law. It is an emergency medicine provider. Its NPI Number is 1427005008. It has an office address at 265 Brookview Centre Way, Suite 400, Knoxville TN 37919.  SEP is owned and controlled by Team Health Holdings.  SEP is one of the local TeamHealth entities that submitted claims for reimbursement to the Buncombe County Plan for emergency department services rendered by Team Health professionals.

19.     ECC and SEP are two of over 100 local practice entities nominally separate and independent from TeamHealth.  On information and belief, ECC and SEP have several individual members or owners.  This is because a medical professional association or similar practice group entity must be owned by one or more licensed physicians to comply with state "corporate practice of medicine" laws.  In its business model, TeamHealth in the normal course of business ensures that at least one of the individual physicians listed as an owner is also employed by another TeamHealth entity.  In this way, TeamHealth seeks to sidestep "corporate practice of medicine" laws and retain relevant control.

---

[9] The NPI is a HIPAA Administrative Simplification Standard.  NPI numbers are unique identification numbers for covered health care providers.  *See* www.CMS.gov.

20.     Under TeamHealth's model, a single physician may be designated to be a listed member of, and to "own," up to many practice groups in a single State.   There will be form agreements issued, including a management services agreement between the local group and another entity owned by TeamHealth; an employment agreement between each physician and the group; and a shareholder/buyout agreement whereby TeamHealth takes over the practice.

21.     TeamHealth itself is owned by a large private equity firm, Blackstone, which acquired the enterprise in 2017 for $6.1 billion. TeamHealth among other things provides ED staffing and administrative services to hospitals through a network of subsidiaries, affiliates, and nominally independent entities and contractors, which operate in nearly all states and which Defendants refer to collectively as the "TeamHealth System."

22.     TeamHealth designed the complex structure of the TeamHealth System to circumvent state laws that prohibit general business corporations from practicing medicine, employing doctors, controlling doctors' medical decisions, or splitting professional fees with doctors, aka, the corporate practice of medicine.  TeamHealth deploys numerous local subsidiaries and affiliates with varying names intentionally to efface its own involvement in the relevant practices, as further discussed below.

## III.     JURISDICTION AND VENUE.

23.     This Court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs, and under 28 U.S.C. § 1332(d) of the Class Action Fairness Act, because this is a class action in which at least one Plaintiff or class member is a

citizen of a different State than at least one Defendant and the classwide amount in controversy is over $5,000,000.

24.     This Court has personal jurisdiction over Defendants because they were located in or conducted relevant business activities in the State of Tennessee during the pertinent times or otherwise had such minimum contacts with the forum as to make it fair and reasonable for them to be sued here. Defendants are believed to do business in Tennessee by staffing EDs in towns including Union City, Tazewell, Sevierville, Livingston, Carthage, Winchester, Pulaski, Lawrenceburg and Athens, Tennessee.

25.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to this Complaint occurred in this District; and because the Defendants transact business in this District, including doing business with EDs and hospitals in this District, and engaging in relevant coding and billing activities here.

## IV.     DETAILED FACTS.

### a.     Background on TeamHealth.

26.     TeamHealth has entered into arrangements with numerous hospitals to replace local ED practice groups with TeamHealth's outsourced staff and attendant administrative, operational, coding and billing infrastructure. TeamHealth staffs those emergency departments with ED physicians and other staff under contract (directly or indirectly) with TeamHealth, and bills payors for the services these staffers provide.

27.     Midlevel practitioners, also called non-physician practitioners, advanced practice clinicians ("APCs") or advanced clinical practitioners ("ACPs") are health care workers who have

a defined scope of practice. They can include PAs and NPs. Midlevels have training less than a physician but greater than a nurse or medical assistant.

28.     TeamHealth organizes groups of local personnel to staff hospitals using locally formed business entities such as ECC and SEP. These local, small entities are reflected on paper as the employer of (or contractor for) the TeamHealth-supplied ED staff at the relevant hospitals visited by enrollees of the Plaintiff's Plan.

29.     After TeamHealth's healthcare contractors provide a service to a patient, an administrative group (believed to be HCFS) at or overseen by TeamHealth's centralized corporate offices creates a health insurance claim by converting the medical record of TeamHealth's healthcare contractors into a health insurance claim. TeamHealth sends the claim to applicable payors including insurers, TPAs of self-funded plans, or directly to the patient.

30.     The ED staff who treat the patient do not see the insurance claims that TeamHealth creates, even though the claims are submitted in their names. Nor do they receive the money that TeamHealth collects. Rather, TeamHealth has the money sent directly to TeamHealth. Generally, TeamHealth pays physicians and midlevels a fixed hourly and/or per patient or per transaction fee. Using this scheme, TeamHealth keeps most of the funds that its staff generate.

31.     In the normal course of billing and payment, payors often do not see the medical records generated by TeamHealth's healthcare staff, or, if medical records are sent, do not review those records using a coding expert who would have the capacity to uncover the fraud. Payors typically accept the CPT codes as submitted and calibrate payments accordingly in a process which is merely administrative and/or automated, with no independent judgment exercised by a CPT

11

coding expert regarding whether a facially proper[10] CPT code is in fact inflated. This information asymmetry is ripe for fraud, and TeamHealth has exploited it.

32. After TeamHealth convinces a hospital to "outsource" its ED to them, TeamHealth acts as an intermediary or gatekeeper between its own (directly or indirectly employed or contracted) healthcare workers, and the Medicare authorities, insurance companies and plans that pay for their services. By acting as an intermediary, TeamHealth gets to bill for services performed by its healthcare staff, but without any oversight.

33. TeamHealth's individual healthcare contractors and employees have no say in how the medical records that they generate are translated into CPT codes and bills.

34. TeamHealth has grown dramatically by acquiring other staffing/billing companies focused on ED services and other sectors. It has become one of the largest suppliers of outsourced healthcare staffing and administrative services for hospitals and other healthcare providers in the United States. TeamHealth operates nationwide, claiming to control hospital EDs in 47 states, and employs more than 18,000 individuals.

35. When sending bills or providing services, TeamHealth usually does not use its own name or NPI; instead, it uses the names and NPIs of its doctors or one of the 100-plus entities who are the local affiliates and do not carry the TeamHealth name. Because TeamHealth uses many different entities and names to carry out its billing scheme, it has been able to mask the enormity of its enterprise and the sheer number of times it has carried out this scheme. Here, as noted, the local entities for the County included ECC and SEP.

---

[10] The CPT codes used by TeamHealth superficially appear to be facially proper, in the sense that there is a small group of CPT codes used for ED services, and the codes selected by TeamHealth for its billing fall into that group. However, TeamHealth coders routinely select the wrong, inflated code out of that available code set.

36. TeamHealth structures its business operations to support its profit-maximizing strategy while disguising its participation in the corporate practice of medicine. The corporate practice of medicine doctrine prohibits corporations from practicing medicine or employing a physician to provide professional medical services. This rule promotes doctors working for themselves or with other doctors. It is intended to safeguard against the commercialization of the practice of medicine which risks putting financial incentives above patient care.

37. TeamHealth seeks to circumvent state laws banning the corporate practice of medicine by creating or acquiring and maintaining a large number of these local entity practices. TeamHealth owns and operates a number of regional corporations, which in turn own these subsidiaries or employ individual physicians who are used to control the local practice entities that employ physicians as purported independent contractors. TeamHealth, the corporation, thus avoids directly employing the doctors it controls.

38. Through HCFS, TeamHealth handles all the medical coding and billing for work performed by its staffers around the country and uses uniform procedures across the enterprise designed to maximize revenue. It centrally controls its workforce by setting procedures for their work, when and how much they work, and what they are paid. On information and belief, Ameriteam assists in creating these policies. TeamHealth decides what codes to assign and how much to bill for its personnels' services. When local medical staff complete their work with a patient, they submit medical records to HCFS which engages in upcoding, overbilling, and aggressively collecting on the bills.

39. Medical coding is the process of converting a medical record into a billing code that accurately describes the medical service provided. Billing codes are used by CMS and private

13

payors to pay for services. Standardized health care billing codes are called CPT codes. HCFS determines what CPT codes to bill and sends claims containing these codes to payors when TeamHealth seeks payment for services.

40.    A central administrative group at TeamHealth's corporate offices in Tennessee handles and manages the coding. The coders take the medical records generated by TeamHealth's healthcare staffers and decide what CPT code to bill for the work performed.  After reviewing the medical record generated by the TeamHealth medical team staffing the hospital ED in question, a "coder" assigns the CPT codes. HCFS then submits the codes as a claim, however, using the name of the relevant local physician group (such as ECC or SEP).

41.    The coders are administrative employees hired and trained by TeamHealth.  They are not ED physicians and they usually lack medical training.  TeamHealth's physicians and midlevels do not see the codes selected by these coders, nor do those front-line workers see the insurance claims or billed amounts. They have no idea how TeamHealth bills for their services even though the bills often are submitted in their names for services they rendered. The providers are not involved in assigning codes to the services they provide, and they are not consulted regarding what codes should be billed.

42.    One of TeamHealth's healthcare workers described the situation: "As an emergency medicine physician, I have absolutely no idea to whom or how much is billed in my name. I have no idea what is collected in my name. This is not what I signed up for and this isn't what most other ER docs signed up for. I went into medicine to lessen suffering, but as I understand

14

more clearly my role as an employee of TeamHealth, I realize that I'm unintentionally worsening some patients' suffering."[11]

43.     When seeking payment for services, TeamHealth makes a representation that the CPT codes accurately describe the service provided by the TeamHealth unit at the hospital ED in question.  When TeamHealth does not include medical records showing what services were provided, a payor cannot compare the codes on the claims to documentation regarding the services.  When TeamHealth does include the medical records, this is still insufficient to let personnel at the payor end do more than catch facial errors.  That is because deconstructing a CPT code after the fact to see if it was accurate and supported by the medical records requires special expertise and can be time-consuming. Because of the large volume of claims submitted and the laws prohibiting health insurance fraud, payors reasonably rely on TeamHealth's representations.

44.     TeamHealth relies on a simple calculus:  that the effort it takes to manually go through the claims for payment and weed out the ones with overbilling via inflated CPT codes is inefficient if not cost-prohibitive as a process of identifying and rectifying individual cases of the overbilling.  However, one or more insurance company payors have used their large cohort of claims to engage in statistical analysis and determine the systematic nature of the overbilling.[12]  And the federal government has performed a similar analysis with regard to Medicare claims affected by analogous fraud.[13]

---

[11] *See* Isaac Arnsdorf, "How Rich Investors, Not Doctors, Profit From Marking Up ER Bills," ProPublica, June 12, 2020, https://www.propublica.org/article/how-rich-investors-not-doctors-profit-from-marking-up-er-bills (last accessed March 16, 2022).
[12] *Celtic Ins. Co.*, *supra; United Healthcare; supra.*
[13] *Hernandez, supra.*

45.     TeamHealth is able to conceal false information in its health insurance claims because (a) the healthcare staffer who provided the service does not see the health insurance claims that TeamHealth submits, (b) the patient who received the service does not see the health insurance claim that TeamHealth submits, and (c) TeamHealth may not provide complete records to payors. TeamHealth abuses this information asymmetry to perpetrate the fraud.

**b.      Additional facts regarding TeamHealth corporate structure.**

46.     To comply with laws restricting the corporate practice of medicine, TeamHealth seeks to establish a purported independence for the numerous local medical practices such as ECC and SEP.  In order to comply with state laws, these practices on their face appear to be independent professional associations, or PAs, owned by doctors or other individuals.  Various state laws in this regard including in North Carolina require the PA to be owned by a licensed physician.

47.     The PA then contracts with TeamHealth subsidiaries for administrative services, such as coding and billing, in exchange for payment.  In truth, however, these PAs are not independent but are controlled with their coding and billing activities coordinated by the enterprise like a cartel.  They are often nominally owned by a physician who also is an executive at TeamHealth.  For the two local groups involved in the *Molina Healthcare*[14] case, when a new executive took over as owner in 2019, he testified that he could not even remember how he "bought" the entities or if he ever paid anyone the $2 nominal price of their shares.[15]  This unusual business structure has been criticized by litigants as well as commentators as being a "sham."[16]

---

[14] *ACS Primary Care Physicians Southwest, P.A. v. Molina Healthcare, Inc.*, No. 2017-77084 (District Court of Harris County, Texas).
[15] Arnsdorf 2020.
[16] Arnsdorf 2020.

16

48.     By its dictionary definition, a "cartel" is "an association of manufacturers or suppliers with the purpose of maintaining prices at a high level and restricting competition."[17] Defendants' use of numerous separately incorporated physician group entities, under the circumstances, is cartel-like behavior.

49.     What facially appear to be small separate independent physician practices, with differing NPI numbers, that are spread throughout the country, are actually all members of the TeamHealth enterprise following uniform rules and procedures emanating from Team Health Holdings and/or Ameriteam and obligating the local practice entity to direct all of their medical coding and billing through a single bottleneck entity – HCFS – as the point of interface between TeamHealth and its doctors on the one hand, and TeamHealth and its payors on the other.

50.     During the pertinent times, HCFS coded and submitted claims to insurers and TPAs pursuant to policies set by Team Health Holdings and Ameriteam.  TeamHealth including through HCFS employs a dedicated staff that prepares and submits insurance claims based on medical records received from physicians.  On information and belief, many of these individuals are not certified professional coders, but rather depend on HCFS, Team Health Holdings or Ameriteam for their training regarding the use of CPT codes.

51.     Medical coding requires training to identify the appropriate CPT codes to ensure appropriate and accurate billing.  Certified professional coders must undergo extensive training and certification to ensure that they make justified coding decisions.  The extent to which TeamHealth opts not to use certified professional coders corroborates TeamHealth's focus on maximization of revenue rather than compliance.

---

[17] Google's English dictionary, provided by Oxford Languages.

Case 3:22-cv-00420-DCLC-DCP   Document 1   Filed 11/22/22   Page 17 of 38   PageID #: 17

52.     TeamHealth's error rate for relevant categories of claims greatly exceeded any acceptable error rate for providers of ED services for such claims. The degree to which claims warranted lower CPT codes upon review forecloses the possibility that the upcoding occurred by mistake.  The degree and consistency of TeamHealth's upcoding of claims utilizing CPT codes 99284 and 99285 demonstrates that TeamHealth used a uniform policy or practice of upcoding such claims.

53.     During the pertinent times, TeamHealth used the coding and billing services of HCFS as a recruiting tool with physicians.  TeamHealth marketed the entity publicly as follows, encouraging physicians to rely on its asserted coding and billing expertise, and indicating that this would grow revenue:

> With today's tightening regulations, striking a balance between maintaining compliance and appropriately charging for your health care services has become an arduous task. Poor documentation of your patient records may not only mean lost revenue—it places your practice in danger of fines or worse. The complex nature of emergency medicine only serves to complicate matters even further.

> As an integral part of our billing services, HCFS of TeamHealth provides expert medical coding performed by seasoned, trained professionals. By staying abreast of state and federal guidelines as well as third-party payer coding rules, we help you reduce revenue loss while remaining compliant. HCFS of TeamHealth also offers regular workshops designed to help educate your providers and improve their documentation skills.

> From teaching you and your colleagues how to properly document patient encounters to correctly coding each medical record and performing random audits, we are dedicated to helping you bridge the gap between compliance and revenue.

(Emphasis added).

54.     Based on those and similar representations that were made orally and by other means to them, practicing TeamHealth doctors and nurses at TeamHealth-staffed EDs justifiably relied on TeamHealth to lawfully provide all billing, coding and compliance services.

18

55. TeamHealth's coding and billing entity exists to serve as the centralized coding and billing point for all TeamHealth's numerous local physician practices that it indirectly but ultimately owns, in addition to any services the entity provides to non-TeamHealth medical providers with regard to their billing and coding needs.

56. In marketing itself as having special expertise in billing and coding, TeamHealth acknowledges that it involves special knowledge and expertise for an individual professional coder to determine the CPT code for a particular claim. TeamHealth exploits the combined facts that a) automated claims processing depends on CPT codes being accurate and pays levels based on codes, and b) automated processes do not "go behind" CPT codes to review supporting documentation by having an expert manually check whether in fact the medical records justify the assigned level of CPT coding.

57. For TPAs using an automated process, the computer system depends blindly upon the electronic CPT code embedded in the generic Form CMS-1500 which is processed and paid by an automated means with little human involvement. TeamHealth banks on this system to conceal the fraud caused by the overbilling via inflated CPT codes.

58. TeamHealth recruits medical staff by promising to lift the administrative burden of being a practicing professional off their shoulders.[18] The natural desire of physicians is generally to provide the care to the patients and fulfill their Hippocratic Oath, not to learn how to correctly code and bill Medicare or other payors.

---

[18] See website, https://www.teamhealth.com/what-we-do/emergency-medicine/?r=1, professing how doctors associating with TeamHealth will receive the benefit of TeamHealth "increasing your administrative support."

59.     TeamHealth promises physicians that it will provide great expertise and skill in all aspects of medical practice coding, billing, collections, and compliance.  With regard to billing, during the pertinent times, the HCFS website promised medical providers and provider groups that HCFS would not only take over all their billing but also, make them more money than otherwise:

> Through our full-service revenue cycle management services, HCFS of TeamHealth helps you ease your administrative burden, speed reimbursement and keep days in accounts receivable well below average. We also provide expert guidance designed to help you gain more control over your managed care contracts and optimize your revenue.
>
> Our Comprehensive Billing Services Include:
> *     Helping you set an appropriate fee schedule
> *     Evaluating your existing managed care contracts for efficiency
> *     Negotiating favorable payment rates with managed care payers
> *     Correctly enrolling your physicians and mid-level providers with third-party payers
> *     Performing daily audits to account for all of your billable patient charts
> *     Correctly coding all billable medical records
> *     Maintaining stringent HIPAA and coding compliance
> *     Collecting deductibles and co-payments from your patients, including "self-pay" patients
> *     Getting your insurance claims and patient bills and statements out quickly and accurately, using electronic delivery whenever possible
> *     Researching and handling all refunds
> *     Correctly depositing funds into your group's bank account
> *     Providing a National Patient Service Center to manage billing inquiries from your patients and payers
>
> **Our Diligent Collections[19] Process**
>
> HCFS of TeamHealth has put together dedicated claims denial teams that respond quickly when your claims are denied, underpaid or ignored. HCFS of TeamHealth billing centers utilize advanced technologies such as electronic skip tracing and electronic insurance verification systems to locate hard-to-find patients and identify insurance coverage more quickly in the revenue cycle.
>
> **Let Our Experience Work for You**

---

[19] Rather than write off amounts owed by low-income patients like other providers, TeamHealth has filed lawsuits. On information and belief, TeamHealth filed 4,800 lawsuits in Tennessee between 2017 and 2019 alone.

Boasting the largest emergency physician billing operation in the United States, HCFS of TeamHealth submits approximately 7 million insurance claims and processes invoices for more than 8.6 million patients annually on behalf of our clients. Our billing services are backed by expertise, support and advanced technologies. <u>Many of our clients experience a dramatic increase in their income as a result of utilizing our services.</u>

(Emphasis added). Thus, TeamHealth markets a unitary set of billing and collection practices engaged in by "HCFS of TeamHealth billing centers."

60. Finally, with regard to compliance, the website touts that TeamHealth has "expertise in medical coding guidelines," uses "a rigorous, standards-based coding methodology," engages in "[r]outinely auditing each coding staff member's work on pre-billed records," so that clients can reach the goal of "optimizing growth and stemming revenue loss."

61. The polarity as between TeamHealth and its doctors is reflected by the fact that in multiple class actions its own doctors have sued alleging that TeamHealth had failed to share with them certain patient billing revenues known as resident value units ("RVUs"). That litigation led to a classwide order of preliminary approval dated in the matter of *Forward Momentum, LLC v. Team Health, Inc*., No. 2:17-cv-00346-WKW-JTA (N.D. Ala. March 11, 2022).[20]

62. In its press releases and investor disclosures, Team Health Holdings routinely insists that it does not materially control its medical providers. Rather, it insists that "[a]ll such providers exercise independent clinical judgment when providing patient care. Team Health Holdings, Inc. does not have any employees, does not contract with providers and does not practice

---

[20] (order preliminarily approving a settlement in the amount of $15 million; this constituted a fund to pay back the doctors some of the RVU monies); *see also Sanchez v. Team Health, LLC*, No. 18-21174-CIV-MARTINEZ-OTAZO-REYES, 2021 U.S. Dist. LEXIS 64213, 2021 WL 4990803 (S.D. Fla. March 31, 2021) (in which plaintiff TeamHealth doctors sued TeamHealth alleging the company was not sharing RVU relative value unit payments with its doctors; in this order, the court dismissed the claims in part); *JMF Med., LLC v. Team Health, LLC,* 490 F. Supp. 3d 947 (M.D. La. Sept. 29, 2020) (similar resident value unit RVU allegations).

21

medicine."[21]  Likewise, on its website TeamHealth describes that "TeamHealth does not contract with physicians to perform medical services nor does it practice medicine in any way and nothing in this website is intended to convey any different practice."[22]

        **c.**      **<u>Facts regarding the Plaintiff.</u>**

63.     During the pertinent times, enrollees in the Buncombe County Plan have received ED medical care from one or more TeamHealth-supplied staff.

64.     Based on that care, TeamHealth submitted health insurance claims that the Plan and the Plaintiff paid in reliance on the medical billing codes submitted by TeamHealth.

65.     Under the Buncombe County Plan, the County, as the Plan Sponsor, has the ultimate payment obligation with respect to claims for benefits processed under its administrative services agreement with Blue Cross.

66.     Under the terms of the Plan, the County is the party who pays amounts representing the claims expense for group health plan benefits processed under the County's agreement with Blue Cross.  Blue Cross merely assists in processing claims.

67.     In its self-insured Plan, the County, as the employer of the County employees, elects to pay the health care costs of its covered employees using its own funds, rather than paying premiums to an insurer in exchange for the insurer's assumption of the risk to pay the cost of the employer-promised health care.

---

[21] *See, e.g.*, TeamHealth/Blackstone press release, "TeamHealth to be Acquired by Blackstone," available at https://www.teamhealth.com/news-and-resources/press-release/teamhealth-to-be-acquired-by-blackstone/ (last accessed March 29, 2022).

[22] This content is available at https://www.teamhealth.com/our-company/human-resources/terms-and-conditions/?r=1 (last accessed March 29, 2022).

68.     As the liable party at risk to pay, obligated to pay, and that does in fact pay claims for payment for medical services provided to enrollees in the Plan, and that paid out of its own assets the claims and bills submitted by Team Health affiliates SEP and ECC alleged herein, the County has suffered an actual injury and has standing to sue.

69.     The local TeamHealth entities that submitted claims for reimbursement to the Plan were ECC and SEP. These entities are TeamHealth-related entities and are controlled by TeamHealth with respect to billing and claims processing.

70.     During the period from February 2018 to the present, TeamHealth professionals provided ED services to Plan members at the following locations in Western North Carolina:

   a. Haywood Regional Medical Center, 262 Leroy George Drive, Clyde NC 28721;
   b. Rutherford Regional Medical Ctr., 288 S. Ridgecrest St., Rutherfordton NC 28139;
   c. Mission Hospital- Asheville, 509 Biltmore Avenue, Asheville NC 28801;
   d. Mission Hospital-McDowell, 430 Rankin Drive, Marion NC 28752;
   e. Blue Ridge Regional Hospital, 125 Hospital Drive, Spruce Pine NC 28777;
   f. Transylvania Regional Hospital, 260 Hospital Drive, Brevard NC 28712;
   g. Highlands-Cashiers Hospital, 190 Hospital Drive, Highlands NC 28741; and
   h. Angel Medical Center, 124 One Center Ct., Franklin NC 28734.

71.     On information and belief, SEP has staffed the ED at Haywood Regional Medical Center since at least February 4, 2018, and continues to operate there today.

72.     On information and belief, ECC has staffed the ED at Rutherford Regional Medical Center since at least April 8, 2018, and continues to operate there today.

73.     Since on or about April 15, 2020, TeamHealth has owned and exclusively controlled the local practice group, ECC, which contracts with physicians and midlevels to provide professional services in the EDs at the six hospitals in the Mission HCA network in Western North Carolina. This includes Mission Hospital Asheville, Angel Medical Center, Blue Ridge Regional Hospital, Highlands-Cashiers Hospital, Mission Hospital McDowell, and Transylvania Regional

23

Hospital. Plan members received ED services from TeamHealth professionals at these hospital ED locations during the relevant time period.

74.     According to a class action complaint filed against TeamHealth by physicians, when TeamHealth contracts with a hospital, the hospital agrees that TeamHealth will be the exclusive provider of ED services at that location.[23] Any ED physicians, NPs, or PAs in the area who wish to work at that hospital must agree to work for TeamHealth.[24]

75.     TeamHealth intentionally blocks attempts by insurers and TPAs to contract directly with its affiliated medical groups and demands independence from the hospitals within which it operates in its dealings with insurers and TPAs. It thus intentionally interposes itself between insurers, TPAs, and medical providers.

76.     As a result, TeamHealth's affiliated medical groups have little or no say in, or insight into, how TeamHealth bills for their services.  Nor is it necessary to join each of Team Health's numerous local affiliates, such as ECC or SEP, as defendants.

77.     During the pertinent times, while the County was the plan sponsor and plan administrator, the County received certain administrative services from Blue Cross.  When TeamHealth sent claims for payment under the Plan to Blue Cross, Team Health did not typically send copies of medical records along with the claims.  In this respect, the County falls into a position similar to numerous other TeamHealth billing victims.

---

[23] *JMF Medical, LLC et al. v. Team Health LLC, et al.,* No. 3:19-cv-00837 (M.D. La.).
[24] According to Buncombe County Plan claims data, on or around April 15, 2020, a majority of the individual professionals formerly affiliated with independent physician practice group, Carolina Mountain Emergency Medicine, PA, became affiliated with TeamHealth entities ECC and SEP. At that time, Carolina Mountain Emergency Medicine, PA ceased providing emergency services at Mission-affiliated EDs.

78.     During the pertinent times including the last several years, the Plan has paid over 900 claims for reimbursement submitted by TeamHealth for ED services rendered by TeamHealth professionals. Each claim was received by and paid by the County or its designated agent Blue Cross, who reasonably and justifiably relied on the claims form submission information provided across state lines and by wire or mail by a TeamHealth-related entity.

79.     The County has determined that, in 2021, Team Health coded an extraordinary **60%** (sixty percent) of members' standard ED visits as CPT code 99285 (Level 5).[25] As noted above, CPT code level 5 is only meant to be used for serious conditions consuming substantial ED resources. This 60% level 5 coding rate is much higher than the percentage rate at which other comparable providers utilize CPT code 99285, which is, again, intended to be reserved for particularly severe medical issues requiring exigent treatment. This percentage is also even higher than the high percentages alleged in the *United Healthcare* and *Celtic Ins. Co.* cases.

80.     During the same year (2021), comparable providers in the form of non-TeamHealth-affiliated professionals that served Buncombe County Plan members only coded **39%** of plan members' ED visits as CPT code 99285 (Level 5).[26] This was over 20% less than the TeamHealth rate of level 5 coding.

81.     In the *United Healthcare* matter, United Healthcare alleged that "in 2020, TeamHealth coded over half (51%) of its claims to the United Plaintiffs as 99285. This is far higher than the rate at which other providers utilize CPT code 99285, which (as discussed above) is

---

[25] This figure is based on an analysis of 413 professional claims submitted by TeamHealth for ED services during the year 2021.

[26] This data is based on an analysis of 252 E/M professional claims submitted by non-TeamHealth affiliated professionals for emergency department services rendered to County Plan members during year 2021.

25

reserved for particularly severe medical issues requiring exigent treatment."[27]  Thus the high rate alleged by United Healthcare was still significantly less than the TeamHealth rate herein.

82.     In the *Celtic Ins. Co.* matter, Celtic alleged that "[h]ealth insurance claims data from the past 12 months illustrate the abnormal distribution of medical billing codes submitted by TeamHealth: other ER service providers typically bill Celtic the most-expensive ER billing code less than 30% of the time, while TeamHealth bills Celtic the most-expensive billing code 48% of the time."[28]  Again, the TeamHealth rate alleged herein was significantly higher.

83.     During 2021, both TeamHealth and non-TeamHealth professionals providing ED services to Buncombe County Plan members were serving the same Plan member population, in the same local geographic region, during the same time frame.  Accordingly, there should be minimal variation between the rate at which these two groups of providers billed ED visits at Level 5 (i.e., CPT code 99285).  The over 20% difference (60% versus 39%) in the rate at which TeamHealth providers coded ED visits at CPT code level 5, compared to relevant non-TeamHealth providers, can only be attributed to TeamHealth's upcoding practices, as the only independent variable is provider affiliation, while all other variables (population, time, location) remained the same.

84.     The distribution of the assignment of CPT codes from code level 1 to level 5 should in the absence of fraud follow a normal bell-shaped curve.[29]  Here, however, a statistical analysis reflects an extreme bias in the coding away from a bell-shaped curve and toward an inordinately high distribution of codes at levels 4 and especially, 5.

---

[27] No. 3:21-cv-00364-DCLC-JEM, Doc. 1 ¶ 68.
[28] No. 3:20-cv-00523-DCLC-HBG, Doc. 1 ¶ 13.
[29] *See* Federal Register, Vol. 71, No. 226, Nov. 24, 2006, at 68126 (noting that use of CPT codes "should not facilitate upcoding or gaming" and that "the distribution of codes should result in a normal curve").

85. The distribution of TeamHealth's assignment of CPT codes for ED services rendered to Buncombe County Plan members during 2021 in no way reflects a normal distribution. Rather, the distribution of TeamHealth's ED visit coding is heavily skewed towards Level 5:



86. The inordinately high percentage of CPT code level 5 billing was caused TeamHealth's deliberate and fraudulent upcoding rather than any other reason.

87. Again, CPT code 99285 is reserved for relatively rare cases in which the patient is at imminent risk of death or loss of physiological function. It is appropriate only when extreme circumstances require the most urgent and extensive treatment. The American Medical Association provides the following definition of CPT code 99285:

> Emergency Department visit for the evaluation and management of a patient, which requires these 3 key components within the constraints imposed by the urgency of the patient's clinical condition and/or mental status: A comprehensive history; A comprehensive examination; and medical decision making of high complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function.

88.     During the pertinent times, the County was injured by Defendants' unlawful conduct.  TeamHealth due to its unlawful upcoding practices, for the year 2021, coded 60% of Buncombe County Plan members' standard ED visits as CPT code 99285 (Level 5). As a direct and proximate result, the County paid TeamHealth far more than it otherwise would have paid had TeamHealth coded and billed honestly.  But-for TeamHealth's unlawful upcoding scheme, the total bill for TeamHealth affiliate services paid by the County would have been significantly lower. Due to TeamHealth's upcoding, TeamHealth was unjustly enriched in an amount to be proven at trial, and should be ordered to provide disgorgement.

89.     In the *Celtic Ins. Co.* matter, Celtic alleged that based on its expert's analysis of TeamHealth ED charts, a sample of 29 charts dated between 2015 and 2018 reflected that 18 of the 29 medical records did not support the CPT code that appeared on the medical bill.  The 18 medical bills that were "upcoded" represented 62% of the medical bills reviewed containing CPT code 99285.  A later survey of 10,000 bills dating from 2019-2020 reflected that Team Health upcoded nearly two-thirds of bills that were analyzed.[30]

90.     Likewise, in the *United Healthcare* matter, the United plaintiffs alleged that they had reviewed 47,000 charts supporting commercial health benefits claims submitted by TeamHealth and determined that 75% of the claims TeamHealth submitted to United using the 99285 CPT code for ED visits should have utilized lower-level CPT codes.  United Healthcare gave examples from 2019 to 2021.[31]

---

[30] *Celtic Ins*. complaint ¶¶ 12, 63, 65 & Exs. 1-2.
[31] *United Healthcare* complaint ¶¶ 72-86.

91.     It begs credulity to conclude that over recent years TeamHealth was billing Celtic and United Healthcare overcharges between 62% and 75% of the time on CPT code level 5 bills, while **not** doing the same with regard to the County – a payor just like Celtic and United Healthcare.  TeamHealth used common policies and procedures and coding and billing facilities during this time.  All charts were coded by the same group of TeamHealth workers overseen by the "HCFS Billing Center" and common corporate management personnel.

92.     Anonymous workplace reviews provided at online sites like Indeed.com by self-identified TeamHealth employees further attest to the fact of TeamHealth using common practices at centralized billing facilities – practices conducive to rampant upcoding.  For example, a review by a person identified as a "Hospital Medicine Coder (Current Employee)" in "Louisville, TN" dated March 26, 2019 described in part:

> This company has a LOT of division between departments and management. It's a cubical nightmare that makes you feel like a lab rat. They have impossibly high coding standards with coding rules (not AAPC guidelines) changing daily and you have to keep up. It is very difficult to do and the education is poor (they think it's great-it isn't). Everything correlates to the P&P, a huge binder of ever changing coding rules. The way things are written it is very easy to interpret incorrectly. There is a very high turnover rate due to this. They closely monitor your productivity and work quality, which is a great thing except that the way they do it is terrifying. Everyone is in constant fear of their job. You are monitored in all aspects of your work and personal time at work. Don't take too long in the bathroom. Don't slouch too much at your desk. No noise at all. Don't eat anything that prevents you from being able to type at your desk. It's like a sweat shop. **Their coding cheats the system and you will almost always bill the highest possible level of care.**

(Emphasis added).

93.     As another example, a review by a person identified as a "Coder (Former Employee)" in "Buffalo, NY" dated June 16, 2015 described in part:

No communication at all. Coders feel hopeless. Unreasonable goals without the tools to achieve them. Software systems always going down. Coding supervisor doesn't have management experience, not polite. Headquarters are very slow with response and action. Mandatory OT of less than 24 hrs notice. No advancement. Company wants you to fail. No uplifting. No positive feedback. Constant threats with your job security. Lack of training. Some aspects of coding do not follow CMS or AMA guidelines. **Lots of up coding** and constant duplicate claim submissions for same date of service which results in duplicate payments but no refunds.

(Emphasis added).

94.     There is no reasonable basis to believe that during the same period of time when TeamHealth was upcoding 62% to 75% of all code level 5 claims billed to Celtic and United Healthcare, Team Health was not also upcoding a similar number of its code level 5 claims billed to the County.  Plaintiff alleges that TeamHealth was unjustly enriched because more likely than not, most of the 249 Level 5 claims referenced in the table below were improperly upcoded to level 5 and should have been billed at a lower level and amount instead:

| 2021 TeamHealth Claims for ED services<br>Sent to Buncombe County | | |
|---|---|---|
| Level | Number of Claims | Percentage |
| 5 | 249 | 60.29 % |
| 4 | 109 | 26.39 % |
| 3 | 54 | 13.08 % |
| 2 | 1 | 0.24 % |
| 1 | 0 | 0.0 % |

## V.     CLASS ACTION ALLEGATIONS.

95.     Plaintiff brings this action on behalf of itself and all others similarly situated under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2) and (b)(3), as well as Rule 23(c)(4) in the alternative, as representative of a class defined as follows:

a.  **Unjust Enrichment Class:** All plans and payors that compensated TeamHealth or any TeamHealth affiliate or entity billing on its behalf for ED medical services in the United States or its territories from January 1, 2017 until present.

30

96.     Members of the class are so numerous and geographically dispersed that joinder of all is impracticable. TeamHealth enters into agreements with and bills services to numerous self-funded plans and other payors throughout the nation and in conjunction with those medical coverage plans provides medical services to numerous patients each year in hospitals across the country. Thus, joinder of all members is clearly impracticable.  Numerosity is apparent.

97.     The class is readily identifiable from information and records in the possession of TeamHealth.  Further, Plaintiff's claims are typical of the claims of the members of the class. Plaintiff and all members of the class were damaged by the same wrongful conduct, i.e., Plaintiff and all members of the class had enrollees who received treatment from a TeamHealth staffer and were billed artificially inflated prices for the services received.

98.     Plaintiff will fairly and adequately protect and represent the interests of the class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the other members of the class.  Class counsel representing Plaintiff are experienced in class action litigation.

99.     Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members, here as in other analogous matters in which self-funded plans made up a putative class. Further, TeamHealth has acted on grounds generally applicable to the entire class, thereby making overcharge damages with respect to the class as a whole appropriate or supporting the remedy of injunctive and equitable relief.

100.     Questions of law and fact common to the class include, but are not limited to:

  a.  Whether TeamHealth engaged in one or more systematic and uniform unlawful schemes or courses of conduct by "upcoding" and billing prices above lawful amounts and rates;

  b.  Whether TeamHealth, during the pertinent times, sent inflated bills for services to Plaintiff and class members;

31

c. Whether TeamHealth engaged in a pattern and practice of deceptive activity intended to defraud or deceive Plaintiff and class members;

d. Whether Plaintiff and class members have conferred benefits on TeamHealth such that they are entitled to restitution and disgorgement for payments above the quantum meruit value of TeamHealth's services, under a claim for unjust enrichment;

e. Whether the various TeamHealth Defendants are jointly and severally liable due to their own direct involvement or under the instrumentality rule, for purposes of the unjust enrichment claim;

f. Whether Defendants are liable to plaintiffs and the class members for compensatory, consequential, actual or nominal damages or disgorgement; and

g. Whether equitable, declaratory or injunctive relief is warranted.

101. Plaintiff and members of the class have all suffered, and will continue to suffer, harm and damages as a result of TeamHealth's unlawful and wrongful conduct.

102. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Such treatment will permit a large number of similarly situated and commonly affected self-funded plans to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.

103. Certification of an opt-out class effectuated via the sending and publication of a duly authorized class notice may be optimal in this case given the likelihood that some of the putative class members may have already had their individual claims effectively resolved by virtue of resolutions of relevant actions or by non-public settlements, or who may individually already actively be pursuing such claims now, and therefore, who may desire to opt out.

104. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be

32

pursued individually, substantially outweigh potential difficulties in management of this action. Absent a class action, most members of the class likely would find the cost of litigating their claims to be prohibitive and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

105.    Additionally, TeamHealth has acted and failed to act on grounds generally applicable to Plaintiff and the class and that in the Court's discretion would warrant imposition of uniform relief to ensure compatible standards of conduct toward the class are met, thereby making equitable relief to the class as a whole under Rules 23(b)(1) and (b)(2) an appropriate remedy.

106.    Alternatively, Plaintiff is entitled under Rule 23(c)(4) to the certification of a class with respect to one or more particular issues herein.

## CLAIMS FOR RELIEF

### COUNT I -- UNJUST ENRICHMENT

107.    Plaintiff incorporates by reference the allegations in each of the preceding paragraphs 1 through 106 as if fully set forth herein.

108.    Under the circumstances, Plaintiff, and similarly situated class members, are entitled to an award of relief for unjust enrichment because Plaintiff and class members are entitled to the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain them without the contributors being repaid or compensated.

109.    Plaintiff Buncombe County, and similarly situated class members, have repeatedly conferred measurable benefits on TeamHealth, namely, in the form of making payments for

33

services purportedly rendered by TeamHealth to Plaintiff's and class members' health care coverage enrollees.

110. During the pertinent times, TeamHealth consciously accepted, received and appreciated those benefits; it was aware that Plaintiff and similarly situated class members were making payments to it for services purportedly rendered.

111. During the pertinent times, the benefits conferred by Plaintiff and class members on TeamHealth were not conferred officiously or gratuitously. Rather, the conferral of the benefits in the form of the systematic overpayments relevant hereto was induced and solicited due to the inequitable, unlawful, fraudulent, misleading and unfair and deceptive misconduct of the Defendants as is more specifically alleged hereinabove.

112. As is more specifically alleged hereinabove, during the pertinent times, the Defendants intentionally took actions which were meant to and which did solicit and induce the Plaintiff and similarly situated class members to incur the expenses (i.e., the overpayments) that Plaintiff now seeks to recover through the instant claim on its own behalf and on behalf of the putative class.

113. Retention of these conferred benefits by TeamHealth without adequate compensation would be unjust and inequitable under the circumstances, because the amount of the payment materially exceeded the value of the service for which the billing was sent, namely, provision of medical services to Plaintiff's and class members' enrollees. Under the circumstances, it would be unfair for the Defendant to retain the benefit without the contributor, that is, the Plaintiff, and similarly situated class members, being repaid or compensated by way of recoupment, repayment and disgorgement of the overpayments.

114. Plaintiff and similarly situated class members are not in contractual privity with TeamHealth. There are therefore no means for Plaintiff or class members to secure contractual recovery of the benefits they have conferred on TeamHealth. There is no contract between the Plaintiff or any similarly situated class member and any of the Defendants.

115. In addition or in the alternative, under the circumstances and as was induced by Defendants' systematic above-alleged scheme, which actively concealed material facts, the Plaintiff and similarly situated class members paid TeamHealth's overcharges by mistake when payment was not due. Accordingly, they are entitled as well to restitution on this basis.[32]

116. In addition or in the alternative, under the circumstances and as a result of Defendants' systematic above-alleged scheme, Plaintiff and class members made transfers of funds to Defendants that were induced by fraud or material misrepresentation which are subject to rescission and restitution. Defendants as the transferees are liable in restitution as necessary to avoid unjust enrichment. The subject transfers were induced by fraud and are void because the Plaintiff and class members as transferors had neither knowledge of, nor reasonable opportunity to learn, the character of the resulting transfer or its essential terms.[33]

117. Under the circumstances, Plaintiff and similarly situated class members are without an adequate remedy at law, and therefore are entitled to this equitable remedy.

---

[32] Restatement of the Law 3d, Restitution and Unjust Enrichment, § 6 ("Payment by mistake gives the payor a claim in restitution against the recipient to the extent payment was not due.").

[33] Restatement of the Law 3d, Restitution and Unjust Enrichment, § 13 ("(1) A transfer induced by fraud or material misrepresentation is subject to rescission and restitution. The transferee is liable in restitution as necessary to avoid unjust enrichment. (2) A transfer induced by fraud is void if the transferor had neither knowledge of, nor reasonable opportunity to learn, the character of the resulting transfer or its essential terms. Otherwise the transferee obtains voidable title.").

35

118.    For the reasons stated above, both Plaintiff, and all similarly situated class members, are entitled to equitable remedies including disgorgement and restitution[34] as a result of TeamHealth's unjust enrichment.

## <u>COUNT II – DECLARATORY JUDGMENT</u>

119.    Plaintiff incorporates by reference the allegations in each of the preceding paragraphs 1 through 118 as if fully set forth herein.

120.    This claim is brought under the Declaratory Judgment Act, 28 U.S.C. § 2201.

121.    Under 28 U.S.C. § 2201(a), any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

122.    Under 28 U.S.C. § 2202, further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

123.    Here, there is a real and present controversy between the parties with regard to Defendants' above-alleged practice of systematically and wrongfully overbilling and overcharging the Plaintiff and similarly situated class members for certain ED medical services.

124.    Plaintiff requests that the Court declare the respective rights and obligations of the parties, declare that the Defendants' above-alleged practices are unlawful, and find that the

---

[34] Restatement of the Law 3d, Restitution and Unjust Enrichment, § 49(1) ("A claimant entitled to restitution may obtain a judgment for money in the amount of the defendant's unjust enrichment.").

36

Plaintiff and class members are accordingly entitled to imposition of remedies including but not limited to an accounting, restitution and disgorgement.

125. Plaintiff and class members are entitled to declaratory and injunctive relief to prevent the collection of overcharges based on Defendant's systematic practice of charging inflated amounts for services provided to ED patients.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial of all issues properly triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

1. Certify the matter as a class action, appoint Plaintiff as the class representative and appoint the undersigned counsel to be class co-counsel herein;

2. Enter judgment in favor of Plaintiff and the class on all counts of this Complaint;

3. Award Plaintiff and class members actual consequential, nominal and all other recoverable damages, restitution and disgorgement for unjust enrichment;

4. Enter a declaratory judgment in favor of the Plaintiff and class members and against the Defendants and award and order remedies including an accounting, restitution and disgorgement;

5. Enter equitable and injunctive relief requiring TeamHealth to alter its current policies regarding upcoding, retrain its coding staff to properly code medical claims rather than systematically upcode medical claims, and submit to a regular audit of its coding practices by an independent monitor, with all costs to be paid by TeamHealth;

6. Award Plaintiff and class members their costs, expenses, and reasonable attorneys' fees incurred in this action to the extent permitted by law;

7. Award Plaintiffs and class members all pre- and post-judgment interest to the maximum extent permitted by law; and

8. Award such other relief as this Court deems just and proper.

Dated: November 22, 2022.

/s/ Mary Parker
Mary Parker #06016
Parker & Crofford
5115 Maryland Way
Brentwood, TN 37027
615-244-2445 Tel
615-255-6037 Fax
mparker@parker-crofford.com

Mona L. Wallace (N.C. Bar No. 09021)*
John S. Hughes (N.C. Bar No. 22126)*
Olivia Smith (N.C. Bar No. 58375)*
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
mwallace@wallacegraham.com
jhughes@wallacegraham.com
osmith@wallacegraham.com

Janet Varnell, Esq.*
Florida Bar No. 0071072
VARNELL AND WARWICK, P.A.
1101 E. Cumberland Ave.
Suite 201H, #105
Tampa FL 33602
Tel.: (352) 753-8600
jvarnell@vandwlaw.com

Robert N. Hunter, Jr.*
Higgins Benjamin, PLLC
301 N Elm St Suite 800
Greensboro, NC 27401
Phone: (336) 275-7577
rnhunterjr@greensborolaw.com

*to be admitted pro hac.

*Attorneys for Plaintiff*