# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| **BUNCOMBE COUNTY, NORTH CAROLINA, individually and on behalf of all those similarly situated,** | ) ) ) | |
| | ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 3:22-cv-00420-DCLC-DCP** |
| **TEAM HEALTH HOLDINGS, INC., AMERITEAM SERVICES, LLC and HCFS HEALTH CARE FINANCIAL SERVICES, LLC,** | ) ) ) ) ) | |
| | ) | |
| **Defendants.** | ) ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff, Buncombe County, North Carolina (the "County"), on behalf of itself and a class of those similarly situated, files this First Amended Complaint against Defendants, Team Health Holdings, Inc. ("Team Health Holdings"), Ameriteam Services, LLC ("Ameriteam") and HCFS Health Care Financial Services, LLC ("HCFS") (collectively "TeamHealth"), and alleges and states as follows:

## I.    NATURE OF THE ACTION.

1.    The County is the duly authorized plan sponsor, plan administrator, and funder of the self-funded Buncombe County Government Group Health Plan (the "Buncombe County Plan" or "Plan").  The Plan provides health insurance benefits to numerous County workers and their families in the Western North Carolina region.  The County pays TeamHealth's affiliates including Southeastern Emergency Physicians, LLC ("SEP") and Emergency Coverage Corporation ("ECC") for emergency department ("ED") services provided to the Plan's members.  The County

1

has been and continues to be injured and monetarily damaged by Defendant's abusive and deceptive overbilling practices. During the pertinent times, Plaintiff has paid TeamHealth's inflated medical bills out of its own assets. Now, Plaintiff has confirmed systematic overcharges by the TeamHealth enterprise which staffs multiple hospital-based EDs in Western North Carolina. Accordingly, Plaintiff brings this action for unjust enrichment and violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*. ("RICO").

2.      The County has obtained claims data allowing it to determine that it has been charged a disproportionate volume of bills with inflated Current Procedural Terminology ("CPT") codes for ED services provided by the SEP and ECC TeamHealth affiliates. For instance, as discussed below, TeamHealth's rate of billing for CPT code 99285 greatly exceeds the error rate for such codes. There is no reasonable explanation for the volume of code 99285 claims except the TeamHealth upcoding scheme described further below.

3.      The County has obtained medical records from plan members who received medical treatment from TeamHealth-affiliated practitioners during the relevant times. The records were reviewed by an independent certified medical coding expert to evaluate whether the patient's ED visit was coded at the proper CPT code. The expert reviewed each patient's medical chart to determine if the CPT code assigned by TeamHealth's coders complied with the applicable CPT coding guidelines for Evaluation and Management (E/M) Services in the ED services category.[1] The expert analyzed the following criteria for each ED visit: the appropriateness of the history and/or physical examination performed; the nature of the presenting problem; and the level of medical decision making involved (i.e., straightforward, low, moderate, high), including the

_____

[1] CPT codes are developed, maintained and copyrighted by the American Medical Association ("AMA") to help ensure uniformity in medical billing. *See* American Medical Association, *CPT Evaluation and Management (E/M) Code and Guideline Changes.* Available electronically at https://www.ama-assn.org/system/files/2023-e-m-descriptors-guidelines.pdf. (last accessed Feb. 13, 2023)

2

number and complexity of problem(s) addressed during the encounter, the amount and/or complexity of data reviewed and analyzed, and the risk of complications and/or morbidity or mortality of patient management. The expert found that for the below-alleged instances alleged as RICO predicate acts, the patient encounter did not meet the criteria required to support the CPT codes billed by TeamHealth. The bills were inflated causing Plaintiff to pay more than it would have paid had the bills been properly coded.

4. This overbilling came as no accident, but rather was the fruit of a deliberate business model designed to actively conceal the overbilling from payors. The scheme makes the overbilling ordinarily undetected because (a) it is founded upon upcoding of CPT codes used to bill for similar types of ED services, (b) TeamHealth uses a web of smaller affiliates like SEP and ECC to submit the bills, and (c) the amount in controversy in each bill is relatively small.

5. TeamHealth affiliates with or acquires medical groups across the country. These medical groups have contracts with hospitals or hospital systems under which the groups staff EDs. But that is where the medical groups' involvement ends. From there, TeamHealth handles everything related to the coding and billing of claims from its centralized billing centers. It is TeamHealth that decides which codes to utilize, applying TeamHealth's policies. TeamHealth submits claims to payors under the names of its medical groups. TeamHealth—not the medical groups or the doctors—keeps the profits from its fraudulent billing.

6. Defendants have actively concealed the fraud by splitting up TeamHealth's numerous provider groups staffing hospitals across the nation into over 200 ostensibly separate and independent local practice entities. Each of these local entities is seemingly disconnected from the others, going by many different names. With regard to Plaintiff, the relevant local practice groups included SEP and ECC. While the medical professionals with SEP and ECC provide the

3

services, the coding and billing is done by a single entity, HCFS. Then, the bills for services rendered are sent to payors under the local practice groups' names, not HCFS. This setup is designed to deliberately fragment and disguise the source of the overbilling.

7. The important services provided by the individual healthcare providers and medical professionals, including physicians, nurse practitioners ("NPs"), physician assistants ("PAs") and others are intended by those individuals to serve the public good, and those individuals are unaware of the coding and billing fraud. Nonetheless, the integrity of the coding and billing for the services provided has been infiltrated and corrupted by the TeamHealth enterprise.

8. The TeamHealth ultimate parent entity, namely Team Health Holdings, claims that it does not interfere with the medical independence and discretion exercised by the physicians at the local practice entities. Yet Defendants require that all of these entities direct their coding and billing through a single bottleneck, HCFS, to facilitate fraudulent coding. Defendants know that by separating the coding and billing from the medical practices, the individual physicians and medical professionals will be kept in the dark, oblivious to the fraud. Further, Defendants know that by sending claims to payors under the names of the many seemingly small, independent provider groups, it becomes much more difficult to uncover the overbilling as a common practice or trace it back to the TeamHealth enterprise as a common source.

9. TeamHealth advertises that HCFS coders work under rigorous standards, deliver impeccable service and are routinely audited. TeamHealth represents to the public that it carefully calibrates its compliance criteria and that medical professionals and payors alike can trust the work performed by its coders. These representations are false.

4

10.    It is now evident from other lawsuits,[3] including two before this Court,[4] that Defendants, via their enterprise, have systematically overbilled payors for years.  Accordingly, Plaintiff now brings this action to recover damages and disgorgement reflecting the wrongful overbilling and to seek declaratory and injunctive relief, on behalf of itself and a putative class of others similarly situated.

11.    TeamHealth promises hospitals and physicians that it will increase efficiency and profitability and lift the administrative burdens off practitioners' shoulders.  However, once HCFS becomes involved to do the billing, Defendants use their intentionally obfuscated scheme in order to obtain overpayments from payors.

12.    Following uniform rules, policies, practices, and procedures, HCFS overbills by using improper CPT codes to inflate health insurance claims.  Plaintiff and other class members, either directly or through their third party administrators ("TPAs"), rely on TeamHealth's representations in the form of the CPT codes included on health insurance claims that Defendants transmit across state lines by mail or wire and certify to be "true, accurate and complete."[6] In relying on Defendants' false representations and accepting claims for reimbursement to their detriment, payors pay higher amounts than are properly due.

---

[3] *See United States ex rel. Hernandez v. Team Fin., L.L.C.*, No. 2:16-CV-00432-JRG, 2020 U.S. Dist. LEXIS 26608, *31, 2020 WL 731446 (E.D. Tex. Feb. 13, 2020) (denying motion to dismiss relator's complaint filed under the False Claims Act, 31 U.S.C. § 3729 *et seq.* alleging upcoding and overbilling fraud); *Celtic Ins. Co. v. Team Health Holdings, Inc.*, No. 3:20-cv-00523-DCLC-HBG (E.D. Tenn.) (see Doc. 1, complaint filed Dec. 10, 2020 ¶¶ 8-17 alleging *inter alia* systematic upcoding/overbilling); *Emergency Care Servs. of Pennsylvania v. UnitedHealth Group*, No. 5:20-cv-5094 (E.D. Pa.), *see* ECF No. 37 (counterclaim alleging that TeamHealth engaged in upcoding); *United HealthCare Servs., Inc. v. Team Health Holdings, Inc.*, No. 3:21-cv-00364 (E.D. Tenn.) (same, primary claim); *United States ex rel. Oughatiyan v. IPC the Hospitalist Co., Inc.*, No. 09-C-5418, 2015 U.S. Dist. LEXIS 19066, 2015 WL 718345 (N.D. Ill. Feb. 17, 2015) (denying in part motion to dismiss FCA claim for TeamHealth hospitalist overbilling); *U.S. ex rel. Mamalakis vs. Anesthetix Management LLC*, 2021 U.S. App. LEXIS 36193, 2021 WL 5818476 (Dec. 8, 2021) (involving TeamHealth anesthesiologist overbilling).
[4] *See Celtic Ins. Co., supra*; *United Healthcare Servs., Inc., supra*.
[6] CMS Form 1500, see preprinted statements on reverse side of the hardcopy version.  The electronic version is deemed to include the same.

13.     Medical professionals generally bill payors for ED services using consecutively numbered CPT codes from 99281 to 99285.  Higher level codes indicate more extensive and complex treatment billed at higher rates.

14.     Since at least 2017, Defendants have covertly and methodically engaged in upcoding, and submitted fraudulent billing to Plaintiff and numerous other payors. Defendants overbilled by using inflated CPT codes that inaccurately reflected the level of care provided.

15.     TeamHealth perpetrated its schemes for the purpose of generating additional profit. The scheme defrauded the Plaintiff and similarly situated plans and payors cumulatively out of tens of millions of dollars over the statute of limitations period.

## II.     PARTIES.

### A.     Plaintiff.

16.     The County is organized under North Carolina law. N.C.G.S. § 153A-1 *et seq*. The County may sue and be sued. N.C.G.S. § 153A-11. To the extent North Carolina law grants standing for certain causes of action to "persons," such standing is also granted to the County. *See* N.C.G.S. § 12-3(6) ("persons" includes bodies politic and corporate). The County paid TeamHealth's bills for medical services directly out of its own funds and did not merely pass the bills through to some other payor.  Accordingly, the County has standing to bring this suit.

17.     During the pertinent times, nonparty Blue Cross Blue Shield of North Carolina ("Blue Cross") provided claims administration services for the County pursuant to an Administrative Services Agreement ("ASA").[7]

---

[7] In the health insurance industry, a self-funded health insurance plan with a TPA (such as the County's Plan here) is commonly referred to as an "Administrative Services Only" ("ASO") Plan.

6

B. **Defendants**.

18.    Defendant Team Health Holdings is a Delaware corporation with its principal place of business at 265 Brookview Centre Way, Suite 400, Knoxville, Tennessee 37919. For jurisdictional purposes it is a citizen of Delaware and Tennessee.  It may be served with process at its corporate office address or c/o its registered agent, Corporation Service Company, 2908 Poston Ave., Nashville, TN 37203-1312.  Team Health Holdings is the ultimate parent company for the TeamHealth organization.  Upon information and belief, it was directly involved in promulgating and implementing the unlawful policies and practices alleged herein, and/or, is otherwise directly legally responsible for the conduct alleged herein, in addition to the responsibility shared by any other named Defendant.

19.    Defendant Ameriteam is a Tennessee limited liability company.  Its sole member is Team Finance LLC, whose sole member is Team Health Holdings. On information and belief, Ameriteam employs executive officers of TeamHealth, issues policies that govern all TeamHealth entities in conjunction with its ultimate parent, Team Health Holdings, and provides operational direction and administrative support to TeamHealth entities. Its principal place of business is at the 265 Brookview Centre Way address. Ameriteam is a citizen of Delaware and Tennessee.  It may be served with process at its corporate office address or c/o its registered agent, Corporation Service Company, 2908 Poston Ave., Nashville, TN 37203-1312.

20.    Defendant HCFS is a Florida limited liability company with a principal office situated in Knoxville, Tennessee.  It may be served at its principal office address at 265 Brookview Centre Way, Suite 400, ATTN: Legal Dept., Knoxville, TN 37919-4049; or via its registered agent, Corporation Service Company, 2626 Glenwood Avenue, Suite 550, Raleigh NC 27608.  On information and belief, the sole member of HCFS is Team Radiology, LLC, the sole member of

7

Team Radiology, LLC is Team Finance LLC, and the sole member of Team Finance LLC is Team Health Holdings. HCFS provides or during pertinent times provided billing, coding, and collection services for the TeamHealth enterprise, as well as for others.

21.     Nonparty ECC is a business entity on information and belief formed and organized under Tennessee law. It is an emergency medicine provider. Its National Provider Identifier ("NPI")[8] Number is 1356379382. It has an office address at 1431 Centerpoint Drive, Suite 100, Knoxville TN 37932.  ECC is owned and controlled by Team Health Holdings.  ECC is one of the TeamHealth local practice entities that submitted claims for reimbursement to the Buncombe County Plan for ED services rendered by TeamHealth professionals.

22.     Nonparty SEP is a business entity on information and belief formed and organized under Tennessee law. It is an emergency medicine provider. Its NPI Number is 1427005008. It has an office address at 265 Brookview Centre Way, Suite 400, Knoxville TN 37919.  SEP is owned and controlled by Team Health Holdings.  SEP is one of the local TeamHealth entities that submitted claims for reimbursement to the Buncombe County Plan for emergency department services rendered by Team Health professionals.

23.     ECC and SEP are two of over 200 local practice entities nominally separate and independent from TeamHealth.  On information and belief, ECC and SEP have several individual members or owners.  This is because a medical professional association or similar practice group entity must be owned by one or more licensed physicians to comply with state "corporate practice of medicine" laws.  In its business model, TeamHealth in the normal course of business ensures that at least one of the individual physicians listed as an owner is also employed by another

_____

[8] NPI numbers are unique identification numbers for health care providers.  *See* www.CMS.gov.

TeamHealth entity. In this way, TeamHealth seeks to sidestep "corporate practice of medicine" laws and retain relevant control.

24. Under TeamHealth's model, a single physician may be designated to be a listed member of, and to "own," up to many practice groups in a single State. There will be form agreements issued, including a management services agreement between the local group and another entity owned by TeamHealth; an employment agreement between each physician and the group; and a shareholder/buyout agreement whereby TeamHealth takes over the practice.

25. TeamHealth itself is owned by a large private equity firm, Blackstone, which acquired the enterprise in 2017 for $6.1 billion. TeamHealth among other things provides ED staffing and administrative services to hospitals through a network of subsidiaries, affiliates, and nominally independent entities and contractors, which operate in nearly all states and which Defendants refer to collectively as the "TeamHealth System."

26. TeamHealth designed the complex structure of the TeamHealth System to circumvent state laws that prohibit general business corporations from practicing medicine, employing doctors, controlling doctors' medical decisions, or splitting professional fees with doctors, i.e., the corporate practice of medicine. TeamHealth deploys numerous local subsidiaries and affiliates with varying names intentionally to efface its own involvement in the relevant practices, as further discussed below.

III. **JURISDICTION AND VENUE.**

27. This Court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs, and under 28 U.S.C. § 1332(d) of the Class Action Fairness Act, because this is a class action in which at least one Plaintiff or class member is a

9

citizen of a different State than at least one Defendant and the classwide amount in controversy is over $5,000,000.

28.    This Court has personal jurisdiction over Defendants because they were located in or conducted relevant business activities in the State of Tennessee during the pertinent times or otherwise had such minimum contacts with the forum as to make it fair and reasonable for them to be sued here. Defendants are believed to do business in Tennessee by staffing EDs in towns including Union City, Tazewell, Sevierville, Livingston, Carthage, Winchester, Pulaski, Lawrenceburg and Athens, Tennessee.

29.    Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to this Complaint occurred in this District; and because the Defendants transact business in this District, including doing business with EDs and hospitals in this District, and engaging in relevant coding and billing activities here.

## IV.    DETAILED FACTS.

### a.    Background on TeamHealth.

30.    TeamHealth is one of the largest ED staffing, billing, and collections companies in the United States. It has achieved its tremendous size and market dominance by seeking out and acquiring control of existing healthcare provider groups that provide staffing for hospital-based EDs and other areas of medical specialty. TeamHealth operates nationwide, claiming to control hospital EDs in 47 states, and employs more than 18,000 healthcare professionals.

31.    TeamHealth and its affiliated medical groups contract with numerous hospitals to replace local ED practice groups with TeamHealth's outsourced staff and attendant administrative, operational, coding and billing infrastructure. TeamHealth staffs those EDs with ED physicians

and other medical staff[9] who are under contract (directly or indirectly) with TeamHealth, and bills payors, such as Plaintiff, for the services these staffers provide.

32.     TeamHealth organizes groups of local medical professionals to staff hospitals through its locally formed business entities, such as ECC and SEP. These local, small entities are reflected on paper as the employer of (or contractor for) the TeamHealth-supplied ED staff at the relevant hospitals visited by enrollees of the Plaintiff's Plan.

33.     After TeamHealth convinces a hospital to "outsource" its ED to them, TeamHealth acts as an intermediary or gatekeeper between its own (directly or indirectly employed or contracted) healthcare workers, and the Medicare authorities, insurance companies and plans that pay for their services. By acting as an intermediary, TeamHealth gets to bill for services performed by its healthcare staff, but without any oversight.

**b.     TeamHealth's overbilling scheme.**

34.     After TeamHealth's healthcare contractors provide a service to a patient, an administrative group (i.e., HCFS) at or overseen by TeamHealth's centralized corporate offices generates a health insurance claim by reviewing a medical record of TeamHealth's healthcare contractors and assigning a CPT billing code for the services provided, effectively converting the medical record of TeamHealth's healthcare contractors into a health insurance claim. [10] TeamHealth then sends the claim to the applicable payor including insurers, TPAs of self-funded plans, or directly to the patient.

_____

[9] In addition to physicians, TeamHealth contracts with midlevel practitioners, also called non-physician practitioners, advanced practice clinicians ("APCs") or advanced clinical practitioners ("ACPs") to provide ED staffing. Midlevel practitioners are health care workers who have a defined scope of practice. They can include PAs and NPs. Midlevels have training less than a physician but greater than a nurse or medical assistant.
[10] Medical coding is the process of converting a medical record into a billing code that accurately describes the medical service provided. CPT codes are standardized billing codes used by healthcare providers to bill payors for healthcare procedures and services. Each CPT code denotes the type and degree of medical care that a patient received.

35. The ED staff who treat the patient do not see the insurance claims that TeamHealth generates, even though the claims are submitted in their names. Nor do they receive the payment that TeamHealth collects. Rather, TeamHealth has payments remitted directly to TeamHealth. Generally, TeamHealth pays physicians and midlevel practitioners a fixed hourly rate and/or per patient fee. Using this scheme, TeamHealth keeps most of the funds that its staff generate, and staff remain oblivious as to the actual monetary value generated from their services.

36. In the normal course of billing and payment for ED services, providers and billing companies typically do not submit medical records with insurance claims unless payors request. Payors rely on providers to supply truthful and accurate information with claims and require that providers attest to the accuracy of the claims that they submit. In turn, payors typically accept the CPT codes as submitted and calibrate payments accordingly in a process which is merely administrative and automated, with no independent judgment exercised by a CPT coding expert regarding whether a CPT code is in fact inflated. This information asymmetry is ripe for fraud, and TeamHealth has exploited it.

37. When sending bills for healthcare services provided by a TeamHealth affiliated professional, or providing services, TeamHealth usually does not use its own name or NPI; instead, it uses the names and NPIs of its doctors or one of the 200-plus entities who are the local affiliates. Because TeamHealth utilizes many different entities and names to carry out its billing scheme, it has been able to mask the enormity of its enterprise and the sheer number of times it has carried out this scheme. Here, as noted, the local entities for the County included ECC and SEP.

38. The upcoding that Defendants engage in is a particularly insidious form of fraud that is difficult to uncover and resource intensive to investigate. In this case, the number of TeamHealth affiliates through which TeamHealth carried out its scheme, as well as TeamHealth's

12

intentional failure to disclose the identities of all of its affiliates, further obscured the enterprise's systematic and fraudulent upcoding scheme.

39.     TeamHealth structures its business operations to support its profit-maximizing strategy while disguising its participation in the corporate practice of medicine. The corporate practice of medicine doctrine prohibits corporations from practicing medicine or employing a physician to provide professional medical services. This rule promotes doctors working for themselves or with other doctors. It is intended to safeguard against the commercialization of the practice of medicine which risks putting financial incentives above patient care, and corporate interests over patient interests.

40.     TeamHealth seeks to circumvent state laws banning the corporate practice of medicine by creating or acquiring and maintaining a large number of these local practice entities which seemingly are unrelated to the TeamHealth enterprise. TeamHealth owns and operates a number of regional corporations, which in turn own these subsidiaries or employ individual physicians who are used to control the local entities that employ physicians as purported independent contractors. TeamHealth thus avoids directly employing the doctors it controls.

41.     In its press releases and investor disclosures, Team Health Holdings routinely insists that it does not materially control its medical providers.  Rather, it insists that "[a]ll such providers exercise independent clinical judgment when providing patient care. Team Health Holdings, Inc. does not have any employees, does not contract with providers and does not practice medicine."[11]  Likewise, on its website TeamHealth describes that "TeamHealth does not contract

---

[11] *See, e.g*., TeamHealth/Blackstone press release, "TeamHealth to be Acquired by Blackstone," available at https://www.teamhealth.com/news-and-resources/press-release/teamhealth-to-be-acquired-by-blackstone/ (last accessed March 29, 2022).

13

with physicians to perform medical services nor does it practice medicine in any way and nothing in this website is intended to convey any different practice."[12]

42. The polarity as between TeamHealth and its doctors is reflected by the fact that its own doctors have sued alleging that TeamHealth had failed to share with them certain patient billing revenues known as resident value units ("RVUs").[13]

43. To comply with state laws restricting the corporate practice of medicine, TeamHealth seeks to establish a purported independence for the numerous local medical practices such as ECC and SEP. To comply with state laws, these practice groups on their face appear to be independent professional associations, or PAs, owned by doctors or other individuals, when in fact that are controlled entirely by the TeamHealth enterprise.

44. The PA entity then contracts with TeamHealth subsidiaries for administrative services, such as coding and billing, in exchange for payment. In truth, however, these PA entities are not independent but are controlled with their coding and billing activities coordinated by the enterprise like a cartel. They are often nominally owned by a physician who also is an executive at TeamHealth. For the two local groups involved in the *Molina Healthcare*[14] case, when a new executive took over in 2019, he testified that he could not even remember how he "bought" the

---

[12] This content is available at https://www.teamhealth.com/our-company/human-resources/terms-and-conditions/?r=1 (last accessed March 29, 2022).

[13] *See Forward Momentum, LLC v. Team Health, Inc.*, No. 2:17-cv-00346-WKW-JTA (N.D. Ala. March 11, 2022) (preliminarily approving a settlement in the amount of $15 million; claim alleged RVU monies); *see also Sanchez v. Team Health, LLC*, No. 18-21174-CIV-MARTINEZ-OTAZO-REYES, 2021 U.S. Dist. LEXIS 64213, 2021 WL 4990803 (S.D. Fla. March 31, 2021) (similar RVU allegations); *JMF Med., LLC v. Team Health, LLC,* 490 F. Supp. 3d 947 (M.D. La. Sept. 29, 2020) (similar RVU allegations).

[14] *ACS Primary Care Physicians Southwest, P.A. v. Molina Healthcare, Inc*., No. 2017-77084 (District Court of Harris County, Texas).

14

entities or if he ever paid anyone the $2 nominal price of their shares.[15] This unusual business structure has been criticized as being a "sham."[16]

45.     By its dictionary definition, a "cartel" is "an association of manufacturers or suppliers with the purpose of maintaining prices at a high level and restricting competition."[17] Defendants' use of numerous separately incorporated physician group entities, under the circumstances, is cartel-like behavior.

46.     What facially appear to be small separate independent physician practices, with differing NPI numbers, that are spread throughout the country, are actually all members of the TeamHealth enterprise operating under uniform rules and procedures emanating from Team Health Holdings and/or Ameriteam, and obligating the local practice entity to direct all of their medical coding and billing through a single bottleneck – HCFS – as the point of interface between TeamHealth and its doctors on the one hand, and TeamHealth and its payors on the other.

**c.      Role of HCFS in the overbilling scheme.**

47.     Through HCFS, TeamHealth handles all the medical coding and billing for medical services performed by its staffers around the country. TeamHealth deploys uniform procedures across the enterprise designed to maximize revenue. It centrally controls its workforce by setting procedures for their work, when and how much they work, and what they are paid. On information and belief, Ameriteam assists in creating these policies.

---

[15] *See* Isaac Arnsdorf, "How Rich Investors, Not Doctors, Profit From Marking Up ER Bills," ProPublica, June 12, 2020,      https://www.propublica.org/article/how-rich-investors-not-doctors-profit-from-marking-up-er-bills      (last accessed March 16, 2022) ("Arnsdorf 2020").
[16] Arnsdorf 2020.
[17] Oxford Languages Dictionary.

15

48.     When local TeamHealth medical staff complete a patient encounter in the ED, they submit medical records to a central administrative group at TeamHealth's corporate offices in Tennessee which engages in upcoding, overbilling, and aggressively collecting on the bills.

49.     After reviewing the medical record generated by the TeamHealth medical team staffing the hospital ED in question, a "coder" assigns a CPT code to bill for the patient encounter. HCFS then submits the codes on a claim form to the appropriate payor. The claim, however, is submitted using the name of the relevant local physician group (such as ECC or SEP).

50.     The coders are administrative employees hired and trained by TeamHealth. They are not physicians and lack medical training. TeamHealth's physicians and midlevels do not see the codes selected by these coders, nor do those front-line workers see the claims or billed amounts. They are unaware of how TeamHealth bills for their services even though the bills often are submitted in their names for services they rendered. These providers are not involved in assigning codes, and they are not consulted regarding what codes should be billed.

51.     One of TeamHealth's healthcare workers described the situation: "As an emergency medicine physician, I have absolutely no idea to whom or how much is billed in my name. I have no idea what is collected in my name. This is not what I signed up for and this isn't what most other ER docs signed up for. I went into medicine to lessen suffering, but as I understand more clearly my role as an employee of TeamHealth, I realize that I'm unintentionally worsening some patients' suffering."[18]

52.     When seeking payment for services, TeamHealth makes a representation that the CPT codes accurately describe the service provided by the TeamHealth unit at the hospital ED in question. Because TeamHealth traditionally does not include medical records documenting the

_____

[18] Arnsdorf 2020.

16

patient encounter with its claim forms, a payor has no ability to audit the claim to assess whether the medical record supports the assigned CPT code. When TeamHealth does include the medical records, this is still insufficient to let personnel at the payor end do more than catch facial errors. That is because deconstructing a CPT code after the fact to see if it was accurate and supported by the medical records requires special expertise and can be time-consuming. Because of the large volume of claims submitted and the laws prohibiting health insurance fraud, payors reasonably rely on TeamHealth's representations to be truthful and accurate.

53.     TeamHealth relies on a simple calculus:  that the effort it takes to manually go through the claims for payment and weed out the ones with overbilling via inflated CPT codes is inefficient if not cost-prohibitive as a process of identifying and rectifying individual cases of overbilling. However, one or more payors have used their cohort of claims data to engage in statistical analysis and elucidate the systematic nature of the overbilling.[19]  The federal government has performed a similar analysis with regard to Medicare claims affected by analogous fraud.[20]

54.     TeamHealth is able to conceal false information in its health insurance claims because (a) the healthcare provider who rendered the service does not see the health insurance claims that TeamHealth submits, (b) the patient who received the service does not see the health insurance claim that TeamHealth submits, and (c) TeamHealth traditionally does not provide the corresponding medical records to payors in support of its health insurance claims. TeamHealth abuses this information asymmetry to perpetrate the fraud.

---

[19] *Celtic Ins. Co.*, *supra; United Healthcare; supra.*
[20] *Hernandez, supra.*

### d. Additional facts regarding TeamHealth corporate enterprise.

55.     During the pertinent times, HCFS coded and submitted claims to insurers and TPAs pursuant to policies set by Team Health Holdings and Ameriteam.  TeamHealth, by and through HCFS, employs a dedicated staff that prepares and submits insurance claims based on medical records received from TeamHealth-affiliated physicians.  On information and belief, many of these coding individuals are not certified professional coders, but rather depend on HCFS, Team Health Holdings or Ameriteam for their training regarding the proper assignment of CPT codes.[21]

56.     During the pertinent times, TeamHealth used the coding and billing services of HCFS as a recruiting tool with physicians.  TeamHealth marketed the entity publicly as follows, encouraging physicians to rely on its asserted coding and billing expertise, and indicating that this would grow revenue:

> With today's tightening regulations, striking a balance between maintaining compliance and appropriately charging for your health care services has become an arduous task. Poor documentation of your patient records may not only mean lost revenue—it places your practice in danger of fines or worse. The complex nature of emergency medicine only serves to complicate matters even further.
>
> As an integral part of our billing services, HCFS of TeamHealth provides expert medical coding performed by seasoned, trained professionals. By staying abreast of state and federal guidelines as well as third-party payer coding rules, we help you reduce revenue loss while remaining compliant. HCFS of TeamHealth also offers regular workshops designed to help educate your providers and improve their documentation skills.
>
> From teaching you and your colleagues how to properly document patient encounters to correctly coding each medical record and performing random audits, we are dedicated to helping you bridge the gap between compliance and revenue.

---

[21] Medical coding requires training to identify the appropriate CPT codes to ensure appropriate and accurate billing, in accordance with the AMA's coding guidelines. Certified professional coders must undergo extensive training and certification to ensure that they make justified coding decisions. The extent to which TeamHealth opts not to use professional coders corroborates TeamHealth's focus on maximization of revenue rather than compliance.

18

(Emphasis added).

57.     Based on those and similar representations that were made orally and by other means to them, practicing TeamHealth doctors and nurses at EDs justifiably relied on TeamHealth to lawfully provide all billing, coding and compliance services.

58.     TeamHealth's coding and billing entity exists to serve as the centralized coding and billing point for all TeamHealth's numerous local physician practices that it indirectly but ultimately owns, in addition to any services the entity provides to non-TeamHealth medical providers with regard to their billing and coding needs.

59.     In marketing itself as having special expertise in billing and coding, TeamHealth acknowledges that it involves special knowledge and expertise for an individual professional coder to determine the CPT code for a particular claim.  TeamHealth exploits the combined facts that automated claims processing depends on CPT codes being accurate and pays based on those codes, and automated processes do not "go behind" CPT codes to review supporting documentation by having an expert check whether the medical records justify the assigned code.

60.     For TPAs using an automated process, the computer system depends blindly upon the electronic CPT code embedded in the generic Form CMS-1500 which is processed and paid by an automated means.  TeamHealth banks on this system to conceal the fraud caused by the overbilling via inflated CPT codes.

61.     TeamHealth recruits medical staff by promising to lift the administrative burden of being a practicing professional off their shoulders.  The natural desire of physicians is generally to provide the care to the patients and fulfill their Hippocratic Oath, not to code and bill claims.

62.     TeamHealth promises physicians that it will provide great expertise and skill in all aspects of medical practice coding, billing, collections, and compliance.  With regard to billing,

during the pertinent times, the HCFS website promised medical providers and provider groups that HCFS would not only take over all their billing but also, make them more money than otherwise:

> Through our full-service revenue cycle management services, HCFS of TeamHealth helps you ease your administrative burden, speed reimbursement and keep days in accounts receivable well below average. We also provide expert guidance designed to help you gain more control over your managed care contracts and <u>optimize your revenue</u>.…
>
> Boasting the largest emergency physician billing operation in the United States, HCFS of TeamHealth submits approximately 7 million insurance claims and processes invoices for more than 8.6 million patients annually on behalf of our clients. Our billing services are backed by expertise, support and advanced technologies. <u>Many of our clients experience a dramatic increase in their income as a result of utilizing our services.</u>

(Emphasis added). Thus, TeamHealth markets a unitary set of billing and collection practices engaged in by "HCFS of TeamHealth billing centers."

      e.      **<u>Facts regarding the Plaintiff.</u>**

63. During the pertinent times, enrollees in the Buncombe County Plan have received ED medical care from one or more TeamHealth-supplied staff.

64. Based on that care, TeamHealth submitted health insurance claims that the Plan and the Plaintiff paid in reliance on the medical billing codes submitted by TeamHealth.

65. Under the Buncombe County Plan, the County, as the Plan Sponsor, has the ultimate payment obligation with respect to claims for benefits processed under its administrative services agreement with Blue Cross.

66. Under the terms of the Plan, the County is the party who pays amounts representing the claims expense for group health plan benefits processed under the County's agreement with Blue Cross. Blue Cross merely assists in processing claims.

67. In its self-insured Plan, the County, as the employer of the County employees, elects to pay the health care costs of its covered employees using its own funds, rather than paying

premiums to an insurer in exchange for the insurer's assumption of the risk to pay the cost of the employer-promised health care.

68. As the liable party at risk to pay, obligated to pay, and that does in fact pay claims for payment for medical services provided to enrollees in the Plan, and that paid out of its own assets the claims submitted by Team Health affiliates SEP and ECC alleged herein, the County has suffered an actual injury and has standing to sue.

69. The local TeamHealth entities that submitted claims for reimbursement to the Plan were ECC and SEP. These entities are TeamHealth-related entities and are controlled by TeamHealth with respect to billing and claims processing.

70. During the period from February 2018 to the present, TeamHealth professionals provided ED services to Plan members at the following locations in Western North Carolina:

  a. Haywood Regional Medical Center, 262 Leroy George Drive, Clyde NC 28721;
  b. Rutherford Regional Medical Ctr., 288 S. Ridgecrest St., Rutherfordton NC 28139;
  c. Mission Hospital- Asheville, 509 Biltmore Avenue, Asheville NC 28801;
  d. Mission Hospital-McDowell, 430 Rankin Drive, Marion NC 28752;
  e. Blue Ridge Regional Hospital, 125 Hospital Drive, Spruce Pine NC 28777;
  f. Transylvania Regional Hospital, 260 Hospital Drive, Brevard NC 28712;
  g. Highlands-Cashiers Hospital, 190 Hospital Drive, Highlands NC 28741; and
  h. Angel Medical Center, 124 One Center Ct., Franklin NC 28734.

71. On information and belief, SEP has staffed the ED at Haywood Regional Medical Center since at least February 4, 2018, and continues to operate there today.

72. On information and belief, ECC has staffed the ED at Rutherford Regional Medical Center since at least April 8, 2018, and continues to operate there today.

73. Since on or about April 15, 2020, TeamHealth has owned and exclusively controlled the local practice group, ECC, which contracts with physicians and midlevels to provide professional services in the EDs at the six hospitals in the Mission HCA network in Western North Carolina. This includes Mission Hospital Asheville, Angel Medical Center, Blue Ridge Regional

Hospital, Highlands-Cashiers Hospital, Mission Hospital McDowell, and Transylvania Regional Hospital. Plan members received ED services from TeamHealth professionals at these hospital ED locations during the relevant time period.

74. On information and belief, when TeamHealth contracts with a hospital, the hospital agrees that TeamHealth will be the exclusive provider of ED services at that location.[23] Any ED physicians, NPs, or PAs in the area who wish to work at that hospital must agree to work for TeamHealth.[24]

75. TeamHealth intentionally blocks attempts by insurers and TPAs to contract directly with its affiliated medical groups and demands independence from the hospitals within which it operates in its dealings with insurers and TPAs. It thus intentionally interposes itself between insurers, TPAs, and medical providers. As a result, TeamHealth's affiliated medical groups have little or no say in, or insight into, how TeamHealth bills for their services. Nor is it necessary to join each of Team Health's numerous local affiliates, such as ECC or SEP, as defendants.

76. During the pertinent times, when TeamHealth sent claims for reimbursement to Blue Cross for administrative processing for the County, Team Health did not typically send copies of medical records to accompany the claims. In this respect, the County falls into a position similar to numerous other TeamHealth billing victims.

77. During the pertinent times including the last several years, the Plan has paid over 900 claims for reimbursement submitted by TeamHealth for ED services rendered by TeamHealth professionals. Each claim was received by and paid by the County or its designated agent Blue

---

[23] *See JMF Medical, LLC et al. v. Team Health LLC, et al.,* No. 3:19-cv-00837 (M.D. La.) (so alleging).
[24] According to Buncombe County Plan claims data, on or around April 15, 2020, a majority of the individual professionals formerly affiliated with independent physician practice group, Carolina Mountain Emergency Medicine, PA, became affiliated with TeamHealth entities ECC and SEP. At that time, Carolina Mountain Emergency Medicine, PA ceased providing services at Mission-affiliated EDs.

Cross, who reasonably and justifiably relied on the representations made in the claims form that was sent across state lines, by wire or mail, by a TeamHealth-related entity.

78.     The County has determined that, in 2021, Team Health coded an extraordinary **60%** (sixty percent) of members' standard ED visits as CPT code 99285 (Level 5).[25] CPT code level 5 is only meant to be used for serious, life-threatening conditions requiring high levels of medical decision making by the medical professional.

79.     The rate at which TeamHealth bills for Level 5 ED visits (60%) is higher than the rate at which other comparable ED providers serving the County Plan bill CPT code 99285, which is, again, intended to be reserved for particularly severe medical issues requiring exigent treatment. This percentage is also higher than the percentages alleged in the *United Healthcare* and *Celtic Ins. Co.* cases.

80.     During the same year (2021), comparable ED providers in the form of non-TeamHealth-affiliated professionals that served Buncombe County Plan members only coded **39%** of plan members' ED visits as CPT code 99285 (Level 5).[26] This was over 20% less than the TeamHealth rate of level 5 coding, for the same plan member population.

81.     TeamHealth's error rate for 99285 claims greatly exceeded any acceptable error rate for other providers of ED services for such claims. The degree to which claims warranted lower CPT codes upon review forecloses the possibility that the upcoding occurred by mistake.

---

[25] This figure is based on an analysis of 435 CMS Form 1500 professional claims submitted by TeamHealth for ED services during the year 2021.

[26] This data is based on an analysis of 259 professional claims submitted by non-TeamHealth affiliated professionals for ED services (billed with CPT codes 99281 through 99285) rendered to Plan members during year 2021. These non-TeamHealth affiliated professionals include the following provider groups that staff various hospital based EDs: Pardee Medical Associates; Sylva Emergency Group LLC; Wake Forest Emergency Providers; Carolinas Emergency Physicians, PA; Riverside Emergency Physicians, LLP; Mid-Atlantic Emergency Med Associates; ECEP II, PA; Gastonia Physician Services; and OBHG North Carolina PC.

23

The degree and consistency of TeamHealth's upcoding of claims utilizing CPT code 99285 demonstrates that TeamHealth used a uniform policy or practice of upcoding such claims.

82.     In the *United Healthcare* matter, United Healthcare alleged that "in 2020, TeamHealth coded over half (51%) of its claims to the United Plaintiffs as 99285. This is far higher than the rate at which other providers utilize CPT code 99285, which (as discussed above) is reserved for particularly severe medical issues requiring exigent treatment."[27]  The rate alleged by United Healthcare was less than the TeamHealth rate herein.

83.     In the *Celtic Ins. Co.* matter, Celtic alleged that "[h]ealth insurance claims data from the past 12 months illustrate the abnormal distribution of medical billing codes submitted by TeamHealth: other ER service providers typically bill Celtic the most-expensive ER billing code less than 30% of the time, while TeamHealth bills Celtic the most-expensive billing code 48% of the time."[28]  The 2021 TeamHealth rate alleged herein was significantly higher.

84.     During 2021, both TeamHealth and non-TeamHealth professionals providing ED services to Plan members were serving the same Plan member population, in the same local geographic region, during the same time frame.  Accordingly, there should be minimal variation between the rate at which these two groups of providers billed ED visits at Level 5 (i.e., CPT code 99285). The over 20% difference (60% versus 39%) in the rate at which TeamHealth providers coded ED visits at CPT code level 5, compared to relevant non-TeamHealth providers, can only be attributed to TeamHealth's upcoding practices, as the only independent variable is provider affiliation, while all other variables (population, time, location) remained the same.

---

[27] No. 3:21-cv-00364-DCLC-JEM, Doc. 1 ¶ 68.
[28] No. 3:20-cv-00523-DCLC-HBG, Doc. 1 ¶ 13.

85.     The distribution of the assignment of CPT codes from code level 1 to level 5 should in the absence of fraud follow a normal bell-shaped curve.[29] Here, however, a statistical analysis reflects a bias in the coding away from a bell-shaped curve and toward an inordinately high distribution of codes at levels 4 and 5.

86.     The distribution of TeamHealth's assignment of CPT codes for ED services rendered to Buncombe County Plan members during 2021 in no way reflects a normal distribution. Rather, the distribution of TeamHealth's ED visit coding is heavily skewed towards higher level codes:



87.     The inordinately high percentage of CPT code level 5 billing during 2021 was caused by TeamHealth's deliberate and fraudulent upcoding rather than any other reason. During 2021, the distribution in CPT coding of Institutional claims for ED visits billed by the hospitals for these same patient encounters is reflected by the following curve:[30]

---

[29] *See* Hospital Outpatient Prospective Payment System and 2007 CY Payment Rates, 71 Fed. Reg. 67960, 68126 (Nov. 24, 2006) (noting that use of CPT codes "should not facilitate upcoding or gaming" and that "the distribution of codes should result in a normal curve").
[30] This figure is based on an analysis of 440 ED visit claims filed with revenue code 0450, reflecting the hospital's institutional claim for the ED visit for the same patients that were seen by TeamHealth.

25



88.     The year 2021 was no outlier. The County's claims data from prior years further evinces TeamHealth's pattern and practice of upcoding for ED services.  For example, the County has determined that, in 2019, TeamHealth coded **63%** (sixty-three percent) of members' standard ED visits as CPT code 99285 (Level 5).[31] During this same year, non-TeamHealth-affiliated ED professionals that served Plan members only coded **40%** of ED visits as CPT code 99285.[32]

89.     TeamHealth staff provide ED medical services to County Plan members at eight different medical centers in Western North Carolina, ranging from small, rural community hospitals to a level II trauma center. There is little variation in the distribution of TeamHealth's ED visit coding for services rendered at trauma centers and services rendered at small, rural community hospitals. The high rate at which TeamHealth bills for 99285 ED visits is consistent across locations.

---

[31] During 2019, TeamHealth providers rendered ED services to County Plan members at Haywood Regional Medical Center and Rutherford Regional Medical Center.
[32] *See supra* note 26 (discussing the relevant practice groups that comprise the "non-TeamHealth-affiliated" ED professionals). The 40% calculation of non-TeamHealth affiliated ED professional claims billed at 99285 is based on an analysis of 719 professional claims for ED services billed by non-TeamHealth practitioners.

26

90.     TeamHealth local entity SEP staffs the EDs at two small community hospitals in Western North Carolina serving County Plan Members—Haywood Regional Medical Center located in Clyde, North Carolina, and Rutherford Regional Medical Center, in Rutherfordton, North Carolina.[33] The distribution in TeamHealth's CPT coding for patients seen by SEP physicians at these community hospitals shows the same inordinately high percentage of Level 5 claims:



91.     Again, CPT code 99285 is reserved for relatively rare cases in which the patient is at imminent risk of death or loss of physiological function. It is appropriate only when extreme circumstances require the most urgent and extensive treatment. The American Medical Association provides the following definition of CPT code 99285:

> Emergency Department visit for the evaluation and management of a patient, which requires these 3 key components within the constraints imposed by the urgency of the patient's clinical condition and/or mental status: A comprehensive history; A comprehensive examination; and medical decision making of high complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the

---

[33] CMS expects that, "a small community hospital may provide more low-level services than high-level services, while an academic medical center or trauma center may provide more high-level services than low-level services." Hospital Outpatient Prospective Payment System and 2007 CY Payment Rates, 71 Fed. Reg. 67960, 68145 (Nov. 24, 2006).

27

problem(s) and the patient's and/or family's needs. Usually the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function.

92.     During the pertinent times, the County was injured by Defendants' unlawful conduct. Due to its unlawful upcoding practices, TeamHealth has consistently upcoded claims for Plan members' ED visits for the purpose of increasing payment amounts. As a direct and proximate result, the County paid TeamHealth far more than it otherwise would have paid had TeamHealth coded and billed honestly. But for TeamHealth's unlawful upcoding scheme, the total bill for TeamHealth affiliate services paid by the County would have been significantly lower. Due to TeamHealth's upcoding, TeamHealth was unjustly enriched in an amount to be proven at trial.

93.     While much of the direct evidence related to TeamHealth's upcoding remains solely in TeamHealth's possession, evidence put forth in other litigation further demonstrates the existence of TeamHealth's uniform policy or practice of upcoding.

94.     In the *Celtic Ins. Co.* matter, Celtic alleged that based on its expert's analysis of TeamHealth ED charts, a sample of 29 charts dated between 2015 and 2018 reflected that 18 of the 29 medical records did not support the CPT code that appeared on the medical bill. The 18 medical bills that were upcoded represented 62% of the medical bills reviewed containing CPT code 99285. A later survey of 10,000 bills dating from 2019-2020 reflected that TeamHealth upcoded nearly two-thirds of bills analyzed.[34]

95.     Likewise, in the *United Healthcare* matter, the United plaintiffs alleged that they had reviewed 47,000 charts supporting commercial health benefits claims submitted by TeamHealth and determined that 75% of the claims TeamHealth submitted to United using the

_____

[34] *Celtic Ins*. complaint ¶¶ 12, 63, 65 & Exs. 1-2.

28

99285 CPT code for ED visits should have utilized lower-level CPT codes. United Healthcare gave examples from 2019 to 2021.[35]

96. It begs credulity to conclude that over recent years TeamHealth was billing Celtic and United Healthcare inflated claims between 62% and 75% of the time, while not doing the same with regard to the County – a payor just like Celtic and United Healthcare. TeamHealth used common policies and procedures and common coding and billing facilities during this time. All charts were coded by the same group of TeamHealth workers overseen by the "HCFS Billing Center" and common corporate management personnel.

97. Anonymous workplace reviews provided at online sites like Indeed.com by self-identified TeamHealth employees further attest to the fact of TeamHealth using common practices at centralized billing facilities – practices conducive to rampant upcoding. For example, a review by a person identified as a "Hospital Medicine Coder (Current Employee)" in "Louisville, TN" dated March 26, 2019 described in part:

> This company has a LOT of division between departments and management. It's a cubical nightmare that makes you feel like a lab rat. They have impossibly high coding standards with coding rules (not AAPC guidelines) changing daily and you have to keep up. It is very difficult to do and the education is poor (they think it's great-it isn't). Everything correlates to the P&P, a huge binder of ever changing coding rules. The way things are written it is very easy to interpret incorrectly. There is a very high turnover rate due to this. They closely monitor your productivity and work quality, which is a great thing except that the way they do it is terrifying. Everyone is in constant fear of their job. You are monitored in all aspects of your work and personal time at work. Don't take too long in the bathroom. Don't slouch too much at your desk. No noise at all. Don't eat anything that prevents you from being able to type at your desk. It's like a sweat shop. **Their coding cheats the system and you will almost always bill the highest possible level of care.**

(Emphasis added).

---

[35] *United Healthcare* complaint ¶¶ 72-86.

98. As another example, a review by a person identified as a "Coder (Former Employee)" in "Buffalo, NY" dated June 16, 2015 described in part:

> No communication at all. Coders feel hopeless. Unreasonable goals without the tools to achieve them. Software systems always going down. Coding supervisor doesn't have management experience, not polite. Headquarters are very slow with response and action. Mandatory OT of less than 24 hrs notice. No advancement. Company wants you to fail. No uplifting. No positive feedback. Constant threats with your job security. Lack of training. Some aspects of coding do not follow CMS or AMA guidelines. **Lots of up coding** and constant duplicate claim submissions for same date of service which results in duplicate payments but no refunds.

(Emphasis added).

99. There is no reasonable basis to believe that during the same period of time when TeamHealth was upcoding 62% to 75% of all level 5 claims billed to Celtic and United Healthcare, Team Health was not also upcoding its claims billed to the County, including a significant number of the 262 level 5 claims referenced in the table below:

| 2021 TeamHealth Claims for ED services Sent to Buncombe County | | |
|---|---|---|
| Level | Number of Claims | Percentage |
| 5 | 262 | 60.23 % |
| 4 | 115 | 26.44 % |
| 3 | 57 | 13.10 % |
| 2 | 1 | 0.23 % |
| 1 | 0 | 0.0 % |

100. As a result of Teamhealth's upcoding, the Buncombe Plan paid TeamHealth more than was warranted on claims. Had TeamHealth assigned billing codes that accurately reflected the services provided, the plan and class members would have paid less.

**f.** **Specific upcoding examples.**

101. The Buncombe County Plan performed a search to locate examples of TeamHealth claims received and paid within recent years. The Plaintiff located the following instances in which the following criteria were met by a submitted claim:

30

a. The claim was billed to the Buncombe County Health Plan for services rendered to a Plan member;

b. The billing provider was a local TeamHealth entity (in this case, ECC or SEP);

c. The billing code was one of the standard CPT codes used for billing for ED services (as opposed to CPT codes used to bill for other services) (the applicable codes are 99281, 99282, 99283, 99284, and 99285).

102. For each of the below specific examples, Plaintiff obtained the medical record chart documenting the patient encounter that was used by TeamHealth's coders to assign a CPT code for billing purposes. Plaintiff had the chart reviewed by a certified medical coding expert to determine whether the claim was accurately coded, in accordance with the AMA's CPT coding guidelines for Evaluation and Management (E/M) Services.

103. The facts for these specific examples reflect that in the following claims, there was overbilling by improper CPT code selection. The CPT code selected by TeamHealth's coders did not meet the criteria required for use of such code. In other words, the medical record documenting the patient encounter did not support the CPT code selected.

104. As to each relevant claim itemized below, Defendants acted deliberately and with intent to defraud, and, with regard to each, Plaintiff has had the relevant file reviewed by an expert. The expert determined that the proper CPT code for the claim in the indicated instances should have been lower than what was billed by TeamHealth. Defendants used the inflated CPT code to justify the charge and to deceive Plaintiff into paying a higher rate that was due.

105. As to each example, the amount that was subsequently paid to TeamHealth was improperly increased as a result of Defendants' fraudulent upcoding. In each instance, Defendants caused fraudulent billing statements to be directed to the Plan, electronically or by mail, across state lines.

31

106.     In each instance, the unlawful upcoding was performed by employees believed to be associated with the HCFS entity; and the claim was thereafter transmitted by TeamHealth across state lines to the Plan or its agent, Blue Cross, with inflated CPT codes embedded therein.

107.     As to each of the claims listed below, the facts involved a covered individual enrolled in the Plan who was either employed by the County, was a family member of an individual employed by the County or was a retired County employee. For each claim, the amount that the Plan paid was set based on the Plan's reliance upon the CPT code provided in the claim form. The Plan set a higher payment amount for a higher CPT code, and a lower payment amount for a lower CPT code.[36] For each example, the Plan paid an amount higher than it would have paid had the appropriate CPT code been used:

a.  **Patient No. 1:** **Date of Service: June 16, 2022. Location: Mission Hospital Asheville. Claim No. 1506546637. TeamHealth Affiliate: ECC (Provider NPI 1861455123).** Patient No. 1 was a 47-year-old female who presented to Mission Hospital ED with intermittent palpitations. The TeamHealth provider that treated Patient No. 1 indicated in the medical record that "[c]linically the patient appears nontoxic and in no obvious distress." Subsequently, Patient No. 1 was deemed stable and discharged home. Defendants' coders intentionally and fraudulently selected the improper CPT code of 99285 for Patient No. 1's ED visit. In fact, the claim should have only been coded at 99284. HCFS therefore submitted a CPT code that was above what it should have been. Based on its fraudulent misrepresentation, HCFS demanded payment of $1,475.00 for the ED visit. On information and belief, HCFS was aware from past experience that this charge amount would have to be reduced to match the applicable allowed amounts negotiated for the Plan. Relying on this fraudulent CPT code, the Plan paid the negotiated rate for a 99285 ED visit, which is higher than the negotiated rate for a 99284 ED visit. Defendants thereby used a CPT code which, because it was relied on and accepted, resulted in a payment approximately 1.5 times greater than it should have been, had the claim been properly coded as 99284. The claim was billed using a claim form identifying the billing provider as ECC with an address at 3429 Regal Drive, Alcoa TN 37701. The claim form was sent electronically to the Plan c/o Registered Agent, BCBS NC at PO Box 2291, Durham NC 27702. The claim form was transmitted across state lines and constituted wire fraud under 18 U.S.C. § 1343, which is a predicate offense under RICO.

---

[36] Pursuant to the County's ASA with Blue Cross, the County is prohibited from disclosing the dollar amounts of the payment rates that have been negotiated for each relevant CPT code.

b. **Patient No. 2:** **Date of Service: October 5, 2021. Location: Mission Hospital Asheville. Claim No. 1349340705. TeamHealth Affiliate: ECC (Provider NPI 1912960030).** Patient No. 2 was a 46-year-old female that presented to the ED with a chief complaint of shortness of breath and prior diagnoses of asthma. The provider's documentation in Patient No. 2's medical record stated that Patient No. 2 presented "alert and in no acute distress." Defendants' coders intentionally and fraudulently selected the improper CPT code of 99285 for Patient No. 2's ED visit. In fact, the claim should have only been coded at 99284. HCFS therefore submitted a CPT code that was above what it should have been. Based on its fraudulent misrepresentation, HCFS demanded payment of $1,432.00 for the emergency department visit. On information and belief, HCFS was aware from past experience that this charge amount would have to be reduced to match the applicable allowed amounts negotiated for the Plan. Relying on this fraudulent CPT code, the Plan paid the negotiated rate for a 99285 ED visit, which is higher than the negotiated rate for a 99284 ED visit. Accordingly, the amount the Plan actually paid was higher than what it would have paid had the claim been properly coded at CPT code 99284. Defendants thereby used a CPT code which, because it was relied on and accepted, resulted in a payment approximately 1.5 times greater than it should have been. The claim was billed using a claim form identifying the billing provider as ECC with an address at 3429 Regal Drive, Alcoa TN 37701. The claim form was sent electronically to the Plan c/o Registered Agent, BCBS NC at PO Box 2291, Durham NC 27702. The claim form was transmitted across state lines and constituted wire fraud under 18 U.S.C. § 1343, which is a predicate offense under RICO.

c. **Patient No. 3:** **Date of Service: July 23, 2021. Location: Mission Hospital Asheville. Claim No. 1337032562. TeamHealth Affiliate: ECC (Provider NPI 1457630931).** Patient No. 3 was a 41-year-old female that presented to the ED with a chief complaint of abdominal pain and urinary frequency. Urinalysis was positive for white blood cells, indicating bladder infection. The provider who treated Patient No. 3 prescribed the patient an anti-inflammatory for mild to moderate pain as well as an antibiotic for treatment of urinary tract infection. Defendants intentionally and fraudulently selected the improper CPT code of 99285 for Patient No. 3's ED visit. In fact, the claim should have only been coded at 99284. HCFS therefore submitted a CPT code that was above what it should have been. Based on its fraudulent misrepresentation, HCFS demanded payment of $1,432.00 for the visit. On information and belief, HCFS was aware from past experience that this charge amount would have to be reduced to match the applicable allowed amounts negotiated for the Plan. Relying on this fraudulent CPT code, the Plan paid the negotiated rate for a 99285 ED visit, which is higher than the negotiated rate for a 99284 ED visit. Defendants thereby used a CPT code which, because it was relied on and accepted, resulted in a payment approximately 1.5 times greater than it should have been, had the claim been properly coded as 99284. The claim was billed using a claim form identifying the billing provider as ECC with an address at 3429 Regal Drive, Alcoa TN 37701. The claim form was sent electronically to the Plan, c/o Registered Agent, BCBS NC at PO Box 2291, Durham NC 27702.

33

The claim form was transmitted across state lines and constituted wire fraud under 18 U.S.C. § 1343, which is a predicate offense under RICO.

d. **Patient No. 4: Date of Service: April 2, 2022. Location: Haywood Regional Medical Center. Claim No. 1484138076. TeamHealth Affiliate: SEP (Provider NPI 1255491585).** Patient No. 4 was a 63-year-old female that presented to the Haywood Regional Medical Center ED with a chief complaint of thrombocytopenia (low platelet count). The provider who treated Patient No. 4 noted in the medical record that "[p]atient's platelet count has been chronically low since 2018 in [sic] today's numbers are no significant change from previous." The provider saw no indications for additional workup and discharged Patient No. 4 home. Defendants intentionally and fraudulently selected the improper CPT code of 99284 for Patient No. 4's ED visit. In fact, the claim should have only been coded at 99282. HCFS therefore submitted a CPT code that was two levels above what it should have been. Based on its fraudulent misrepresentation, HCFS demanded payment of $997.00 for the visit. On information and belief, HCFS was aware from past experience that this charge amount would have to be reduced to match the applicable allowed amounts negotiated for the Plan. Relying on this fraudulent CPT code, the Plan paid the negotiated rate for a 99284 ED visit, which is higher than the negotiated rate for a 99282 ED visit. Defendants thereby used a CPT code which, because it was relied on and accepted, resulted in a payment approximately 2.5 times greater than it should have been, had the claim been properly coded as 99282. The claim was billed using a claim form identifying the billing provider as SEP with an address at 265 Brookview Centre Way #400, Knoxville TN 37919. The claim form was sent electronically to the Plan c/o Registered Agent, BCBS NC at PO Box 2291, Durham NC 27702. The claim form was transmitted across state lines and constituted wire fraud under 18 U.S.C. § 1343, which is a predicate offense under RICO.

e. **Patient No. 5: Date of Service: March 6, 2021. Location: Mission Hospital Asheville. Claim No. 1293236930. TeamHealth Affiliate: ECC (Provider NPI 1861455123).** Patient No. 5 was a 42-year-old female who presented to the Mission Hospital ED with a chief complaint of chest pain. The provider stated in the medical record regarding Patient No. 5's assessment, "[u]nremarkable work-up here with normal sinus rhythm and negative troponin. Stable for discharge." The provider characterized Patient No. 5 as "very low risk" and discharged her home. Defendants intentionally and fraudulently selected the improper CPT code of 99285 for Patient No. 5's ED visit. In fact, the claim should have only been coded at 99284. HCFS therefore submitted a CPT code that was above what it should have been. Based on its fraudulent misrepresentation, HCFS demanded payment of $1,432.00 for the visit. On information and belief, HCFS was aware from past experience that this charge amount would have to be reduced to match the applicable allowed amounts negotiated for the Plan. Relying on this fraudulent CPT code, the Plan paid the negotiated rate for a 99285 ED visit, which is higher than the negotiated rate for a 99284 ED visit. Defendants thereby used a CPT code which, because it was relied on and accepted, resulted in a payment approximately 1.5 times greater than it should have been, had the claim been properly coded as 99284. The claim was

34

billed using a claim form identifying the billing provider as ECC with an address at 3429 Regal Drive, Alcoa TN 37701. The claim form was sent electronically to the Plan, c/o Registered Agent, BCBS NC at PO Box 2291, Durham NC 27702. The claim form was transmitted across state lines and constituted wire fraud under 18 U.S.C. § 1343, which is a predicate offense under RICO.

108.    In each of the above-listed claims, TeamHealth, near the time of the specified date of service, transmitted a bill across state lines to Plaintiff, as an overt act, undertaken with a deliberate intent to deceive, as a part of Defendants' uniform improper billing and coding operations.

109.    Each one of these bills included and reflected an unlawfully inflated charged amount based upon the above-alleged pattern and practice of billing for ED services using inflated CPT codes.

110.    The evidence of pattern and practice derived from the subject claims is corroborated by similar allegations and evidence adduced in one or more other pending or prior lawsuits brought against TeamHealth entities as alleged hereinabove.

111.    The charged amount that TeamHealth bills in its claims forms bears no real relation to the enterprise's actual costs. The charged amounts are vastly and arbitrarily inflated. Not only are the charged amounts set at levels far above the actual cost to the enterprise to provide the services, but also, the charged amounts are far above what Defendants reasonably expect to collect.

112.    Defendants, in negotiation with third-party plan administrators such as Blue Cross Blue Shield NC, agree to accept specific contracted rates for specific services. Defendants are well aware that despite the amount charged for any given service, Defendants must and routinely do accept the contracted rate (also known as the "allowed amount") as payment in full for that service.

## V.    CLASS ACTION ALLEGATIONS.

35

113.     Plaintiff brings this action on behalf of itself and all others similarly situated under Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2) and (b)(3), as well as Rule 23(c)(4) in the alternative, as representative of a class defined as follows:

a. **Unjust Enrichment Class:** All payors or their assignees that compensated TeamHealth or an entity billing on its behalf for medical services in the United States or its territories during the appropriate statute of limitations of period.

b. **RICO Class:** All payors or their assignees that compensated TeamHealth or an entity billing on its behalf for medical treatment in the United States or its territories during the appropriate statute of limitations of period.

c. **Declaratory Judgment Class:** All payors or their assignees that compensated TeamHealth or an entity billing on its behalf for medical treatment in the United States or its territories at any time prior to the filing of the Complaint in this action.

d. United States governmental programs including Medicare, Medicaid, CHIP and Tricare are excluded as class members.

114.     Members of the class are so numerous and geographically dispersed that joinder of all is impracticable. TeamHealth enters into agreements with and bills services to numerous self-funded plans and other payors throughout the nation and in conjunction with those medical coverage plans provides medical services to numerous patients each year in hospitals across the country. Thus, joinder of all members is clearly impracticable.  Numerosity is apparent.

115.     The class is readily identifiable from information and records in the possession of TeamHealth.  Further, Plaintiff's claims are typical of the claims of the members of the class. Plaintiff and all members of the class were damaged by the same wrongful conduct, i.e., Plaintiff and all members of the class had enrollees who received treatment from a TeamHealth staffer and were billed artificially inflated prices for the services received.

116.     Plaintiff will fairly and adequately protect and represent the interests of the class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the other members of the class.  Class counsel representing Plaintiff are experienced in class action litigation.

36

117. Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members, here as in other analogous matters in which self-funded plans made up a putative class. Further, TeamHealth has acted on grounds generally applicable to the entire class, thereby making overcharge damages with respect to the class as a whole appropriate or supporting the remedy of injunctive and equitable relief.

118. Questions of law and fact common to the class include, but are not limited to:

a. Whether TeamHealth engaged in one or more systematic and uniform unlawful schemes or courses of conduct by "upcoding" and billing charges above lawful amounts and rates;

b. Whether TeamHealth, during the pertinent times, sent inflated bills for services to Plaintiff and class members;

c. Whether TeamHealth engaged in a pattern and practice of deceptive activity intended to defraud or deceive Plaintiff and class members;

d. Whether all or some of Defendants are liable persons under RICO;

e. Whether Team Health Holdings, Ameriteam, and HCFS engaged in an association-in-fact under RICO;

f. Whether Team Health Holdings, Ameriteam, and HCFS during the pertinent times through a RICO enterprise committed repeated predicate offenses of mail or wire fraud sufficient to ground a RICO claim;

g. Whether Defendants violated RICO;

h. Whether Defendants are liable to Plaintiff and the class members for damages flowing from Defendants' misconduct, under RICO;

i. Whether Plaintiff and class members have conferred benefits on TeamHealth such that they are entitled to equitable remedies such as restitution for unjust enrichment, and disgorgement for payments above the quantum meruit value of TeamHealth's services;

j. Whether the various TeamHealth Defendants are jointly and severally liable due to their own direct involvement or under the instrumentality rule, for purposes of the unjust enrichment claim;

37

k. Whether Defendants are liable to plaintiffs and the class members for compensatory, consequential, actual or nominal damages or disgorgement; and

l. Whether equitable, declaratory or injunctive relief is warranted.

119. Plaintiff and members of the class have all suffered, and will continue to suffer, harm and damages as a result of TeamHealth's unlawful and wrongful conduct.

120. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Such treatment will permit a large number of similarly situated and commonly affected self-funded plans to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.

121. Certification of an opt-out class effectuated via the sending and publication of a duly authorized class notice may be optimal in this case given the likelihood that some of the putative class members may have already had their individual claims effectively resolved by virtue of resolutions of relevant actions or by non-public settlements, or who may individually already actively be pursuing such claims now, and therefore, who may desire to opt out.

122. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this action. Absent a class action, most members of the class likely would find the cost of litigating their claims to be prohibitive and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

38

123.    Additionally, TeamHealth has acted and failed to act on grounds generally applicable to Plaintiff and the class and that in the Court's discretion would warrant imposition of uniform relief to ensure compatible standards of conduct toward the class are met, thereby making equitable relief to the class as a whole under Rules 23(b)(1) and (b)(2) an appropriate remedy.

124.    Alternatively, Plaintiff is entitled under Rule 23(c)(4) to the certification of a class with respect to one or more particular issues herein.

## CLAIMS FOR RELIEF

### COUNT I
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

125.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 124 as if fully set forth herein.

126.    RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

127.    RICO also provides: "Any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]"

128.    Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3) & 1964(c).

129.    Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3).

130.    Defendants' relevant activities herein significantly affected interstate commerce. With regard to the specific examples of fraudulently upcoded claims alleged hereinabove, during the pertinent times the Defendants engaged in interstate commerce activities including but not

39

limited to the performance of services by TeamHealth staff personnel at the relevant hospital EDs; transmittal of records and data from North Carolina and other States to TeamHealth offices including in Knoxville, Tennessee and Akron, Ohio; performance of coding and billing activities by HCFS; and transmittal of bills from TeamHealth to the Plaintiff.

131.    A RICO "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

132.    For purposes of this Complaint, the relevant enterprise is an association-in-fact, consisting of: (a) Team Health Holdings; (b) TeamHealth's subsidiaries, including specifically Ameriteam and HCFS; and (c) the nominally independent and separate individual professional corporations and other legal entities that employ and/or contract with the individual healthcare contractors or employees whose services TeamHealth sells, and which TeamHealth either indirectly owns through its regional subsidiaries or controls de facto.  The enterprise is an ongoing organization that functions as a continuing unit. The enterprise was created and used as a tool to effectuate a pattern of racketeering activity, and the enterprise had the common purpose of doing the same. Team Health Holdings, AmeriTeam Services, HCFS and the medical provider groups are each "persons" distinct from the enterprise.

133.    Defendants have an existence separate and distinct from the enterprise, in addition to directly participating in and acting as a part of the enterprise.  For example, TeamHealth markets HCFS to provide coding and billing services as a vendor to third parties, in addition to its work on behalf of TeamHealth-controlled local physician and midlevel provider groups stationed at numerous hospital EDs.

40

134.    Although the various components of the enterprise play different roles, they all serve a common purpose: allowing TeamHealth to submit upcoded health insurance claims to payors, and to keep the difference between the amount received as a result of the upcoded claim, and the amount that would have been received had the claim been properly coded.

135.    The front-line healthcare workers employed as employees or as independent contractors by TeamHealth's corporate subsidiaries or de facto controlled affiliates provide medical services to patients in EDs. These individuals also provide the Enterprise with the means to effectuate the upcoding fraud.

136.    TeamHealth's numerous subsidiaries and affiliates have a mixture of corporate ownership structures. Some of TeamHealth's affiliates are wholly owned by TeamHealth; others are partially owned by TeamHealth; and some are wholly owned by others.

137.    Without these corporations and the healthcare contractors who provide medical services, the enterprise would have nothing to upcode. Defendants' regional subsidiaries oversee the entities employing or contracting with healthcare contractors, and they negotiate contracts with hospitals and insurers. Without the regional local practice entities and the hospitals through which they deploy their healthcare workers, the healthcare workers would have no patients to service, and TeamHealth's ability to efficiently coordinate and direct the activities of the entities employing the healthcare workers would be diminished. Thus, it is through the corporate structure of the enterprise that Defendants are able to segregate medical practitioners from all aspects of medical billing, thereby ensuring the continuity of the Enterprise.

138.    Defendants acting through their association-in-fact coordinate the enterprise; perform the upcoding; employ the staff that receives medical records from TeamHealth's

41

healthcare staffers stationed at various EDs; and apply CPT codes to those records in accordance with policies dictated by HCFS, Ameriteam, and/or Team Health Holdings.

139.    Each participant in the enterprise played a distinct and indispensable role, and the participants joined as a group to execute the scheme and further the enterprise's goals. Team Health Holdings and Ameriteam set policies requiring or encouraging the falsification of claims as explained hereinabove.  HCFS carried out those policies by systematically submitting false and misleading claims to Plaintiff and class members for ED services. The various medical groups affiliated with TeamHealth supplied medical services to provide the basis for those upcoded claims, here, through the local North Carolina-organized entities, ECC and SEP, and other similar entities with regard to other putative class members.

140.    The organization of the enterprise, and specifically its use of subsidiaries and purported nominally autonomous independent contractors rather than direct employment of healthcare staff, facilitates the enterprise's upcoding scheme in two ways.

141.    First, if TeamHealth directly employed all the healthcare workers controlled by it, or if it directly owned all the corporate practice groups that provide services on its behalf, TeamHealth would violate various state laws prohibiting the corporate practice of medicine.   The Enterprise's structure is therefore essential to its functioning and to its ability to control and profit from healthcare providers who, at the same time, appear to patients, the public, and to unwitting bill recipients to be independent.

142.    Second, by operating through subsidiaries and other entities that have other seemingly unaffiliated names, TeamHealth creates an impression that patients have received services from a local physician practice group, as opposed to a sophisticated national enterprise that has repeatedly been sued for overbilling abuse among other practices.

42

143. To this end, TeamHealth almost never bills patients or insurance companies under its own name. This creates the illusion that its healthcare physicians and midlevel providers are providing care that is locally owned and directed. This illusion disguises the truth and makes TeamHealth's fraud more difficult to detect, because TeamHealth submits upcoded and inflated health insurance claims under the names of hundreds of different corporate entities, with no indication that they are affiliated with TeamHealth.

144. This illusion helps protect TeamHealth politically and to insulate its activities, including by avoiding public scrutiny of the numerous claims it has made and lawsuits it has filed under various corporate names against individuals and insurance companies in efforts to collect on inflated bills.

145. As the topmost corporate entity of what it calls the "TeamHealth system," TeamHealth conducts and directs the Enterprise and sets policies that govern the functioning of all components of it. TeamHealth is responsible for the actual upcoding, which occurs after its healthcare contractors submit medical records that document the actual services provided to the patient. TeamHealth uses those medical records and improperly exaggerates the services they reflect, consistent with TeamHealth's procedures, in order to submit "upcoded" health insurance claims to insurance companies and other payors.

146. RICO prohibits the conduct of an enterprise "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Racketeering acts are defined at 18 U.S.C. § 1961(1) and include mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

147. TeamHealth, through its enterprise, has committed numerous acts of mail fraud and wire fraud. Specifically, TeamHealth has conducted a scheme to defraud insurers and self-funded plans with specific intent to obtain money from them by materially false and fraudulent

representations, and to use the mails and interstate wires in furtherance of the scheme, including via its medical billing practices.

148. Central to TeamHealth's scheme to defraud is the systematic upcoding of medical services provided to insured patients by healthcare contractors that are under TeamHealth's control. TeamHealth's upcoding scheme misrepresents the nature of the services provided to Plaintiff's enrollees, for the purpose of recovering more money from Plaintiff and patients.

149. Because payors like Plaintiff are generally not provided with the underlying medical records that form the basis of TeamHealth's health insurance claims, and because of the massive volume of health insurance claims, in the normal course of business, payors rely on TeamHealth's representations regarding the nature of the services provided.

150. TeamHealth's scheme has been carried out with the specific intent to defraud Plaintiff and others who are similarly situated. The evidence indicates that TeamHealth has submitted a large proportion of health insurance claims to Plaintiff and others who are similarly situated under the highest CPT codes for services by its healthcare contractors which did not actually comport with the assigned CPT code, thereby rendering those claims false.

151. Instances of upcoding in TeamHealth's health insurance claims are not mere isolated incidents, but instead are part of a pattern and practice of upcoding intended to increase TeamHealth's revenue and profits.

152. The fact that TeamHealth's coding is conducted at a centralized location, under the oversight of TeamHealth management, and without any consultation from the rendering medical providers further demonstrates that TeamHealth's numerous upcoded health insurance claims are not a matter of mere coincidence but rather a concerted effort to defraud.

44

153.     TeamHealth has used the mails and interstate wires in furtherance of its upcoding

scheme to defraud Plaintiff and others who are similarly situated in a number of ways, including:

    a.     Mail and wire receipt of medical records sent from TeamHealth-affiliated hospital ED groups located throughout the country to TeamHealth's centralized coding operations facility in Tennessee;

    b.     Mail and wire transmission of fraudulently upcoded health insurance claims from TeamHealth's Tennessee offices to self-funded plans, including Plaintiff and class members, in numerous states throughout the country;

    c.     Mail and wire transmission of marketing materials to hospitals in order to sell TeamHealth's staffing services and expand the scope of the enterprise;

    d.     Mail and wire receipt of money from Plaintiff, and class members embracing other TPAs and self-funded plans, in various states, representing the unlawful proceeds of TeamHealth's upcoding scheme; and

    e.     Mail and wire communications between TeamHealth and its regional subsidiaries and provider groups in various states, by which TeamHealth promulgates policies and procedures and directs conduct with a goal of maximizing billing revenues.

154.     TeamHealth's repeated acts of racketeering activity form a "pattern" under RICO

because they occurred within ten years of each other, were continuous, and are related.  Through

its many mailings and wire communications in furtherance of its scheme to defraud payors,

TeamHealth has committed numerous acts of racketeering activity that evidence a related pattern

in furtherance of a common scheme, posing a threat of continuous unlawful activity.

155.     These acts are part of a common scheme and have the same purpose: to extract

greater payments from payors than TeamHealth is entitled to.

156.     TeamHealth has adopted policies encouraging upcoding, and has a regular staff

dedicated to coding that is trained to adhere to TeamHealth's practice of upcoding on a systematic

basis. Upcoding is part of TeamHealth's regular way of doing business, and absent judicial

intervention, TeamHealth will continue its upcoding scheme for as long as it remains profitable.

157.     Each participant in the enterprise, and in particular Team Health Holdings, Ameriteam, and HCFS, knew their scheme violated federal and state laws, and acted with the specific intent to defraud the Plaintiff and other payors.

158.     The enterprise engaged in and affected interstate commerce because, among other things, Defendants operated emergency rooms nationwide to support its scheme, accounting for over 17% of the emergency services market in the United States.

159.     Predicate acts of racketeering that Team Health Holdings, Ameriteam and HCFS engaged in include, but are not limited to: (a) the use of wires and mails to submit fraudulent claims to Plaintiff and other payors; (b) the use of wires and mails to coordinate the unlawful activities of the enterprise, including the dissemination of relevant policies and the transmission of medical records from medical groups to coding staff; and (c) the use of the wires and mails to obtain payments from Plaintiff, and to distribute the proceeds of the scheme amongst its members. Plaintiff has above alleged specific and representative examples of the fraudulent insurance claims the enterprise submitted to Plaintiff using the wires and mails.

160.     TeamHealth's upcoding scheme has directly and proximately caused injury to Plaintiff's business and property. Plaintiff suffers injury each time the plan pays a health insurance claim in reliance on TeamHealth's fraudulent coding, where the CPT code on that claim does not accurately represent the service that was actually provided.

161.     Plaintiff's injury and damages consists of the difference between the amount that Plaintiff and its assignors paid TeamHealth on upcoded health insurance claims and the amount that they would have paid had the underlying medical services been properly coded and billed.

46

162.    By virtue of these violations of 18 U.S.C. § 1962(c), and pursuant to 18 U.S.C. § 1964(c), TeamHealth is liable to Plaintiff for three times the damage Plaintiff has sustained, plus the cost of bringing this suit, including reasonable attorneys' fees.

163.    Plaintiff also seeks equitable and injunctive relief including to require TeamHealth prospectively to alter its current policies that require, encourage and incentivize upcoding, retrain its coding staff to properly code medical records rather than systematically upcode them for purposes of maximizing revenues, and submit to a regular audit of its coding practices by an independent monitor, with all costs to be paid by TeamHealth. Absent such an injunction, TeamHealth's upcoding is likely to continue.

## COUNT II
## CONSPIRACY TO VIOLATE RICO

164.    Plaintiff incorporates by reference the allegations in each of the preceding paragraphs 1 through 163 as if fully set forth herein.

165.    Defendants, collectively referred to as TeamHealth, agreed with each other to pursue the schemes described above, namely, upcoding and falsely billing for medical services, with the ultimate objective of realizing increased revenue and profits. Although Plaintiff Buncombe County only learned of this conspiracy recently, it began years ago.

166.    Each of Defendants took overt acts in furtherance of the conspiracy, namely, promulgating policies that required TeamHealth employees responsible for coding insurance claims to upcode those claims; shielding the upcoding conduct from visibility to TeamHealth's own physicians and midlevel providers; aggressively billing payors on the inflated claims; and aggressively engaging in collection and litigation on its bills.

167.    Each Defendant acted in concert in order to facilitate the scheme of the Enterprise.

47

168. Defendants knew that their policies would lead to a pattern and practice of submitting false and inflated claims to Plaintiff and others similarly situated, for the purpose of obtaining money from those payors by inciting them to rely on and pay based on materially false and fraudulent representations, all through the use of the mail and interstate wire transmittals within the meaning of RICO, in furtherance of the scheme.

169. TeamHealth's upcoding scheme has directly caused injury to Plaintiff, who suffers injury each time the Plan pays a health insurance claim in reliance on TeamHealth's coding, where the CPT code on that claim does not accurately represent the service actually provided.

170. Plaintiff's damages consist of the difference between the amount that they actually paid TeamHealth on each upcoded health insurance claim and the amount that they would have paid if the underlying medical services had been properly coded and paid.

171. By virtue of these violations of 18 U.S.C. § 1962(c), and pursuant to 18 U.S.C. § 1964(c), TeamHealth is liable to Plaintiff for three times the damage that Plaintiff and the class sustained, plus the cost of bringing this suit, including reasonable attorneys' fees.

172. Plaintiff also seeks equitable and injunctive relief requiring TeamHealth to alter its current policies incentivizing upcoding, retrain its coding staff to properly code medical records rather than systematically upcoding medical claims, and submit to a regular audit of its coding practices by an independent monitor, with all costs to be paid by TeamHealth. Absent such an injunction, TeamHealth's upcoding is likely to continue.

## COUNT III
## UNJUST ENRICHMENT

173. Plaintiff incorporates by reference the allegations in each of the preceding paragraphs 1 through 172 as if fully set forth herein.

48

174. Under the circumstances, Plaintiff, and similarly situated class members, are entitled to an award of relief for unjust enrichment because Plaintiff and class members are entitled to the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain them without the contributors being repaid or compensated.

175. Plaintiff Buncombe County, and similarly situated class members, have repeatedly conferred measurable benefits on TeamHealth, namely, in the form of making payments for emergency room services purportedly rendered by TeamHealth to Plaintiff's and class members' health care coverage enrollees.

176. During the pertinent times, TeamHealth consciously accepted, received and appreciated those benefits; it was aware that Plaintiff and similarly situated class members were making payments to it for services purportedly rendered.

177. During the pertinent times, the benefits conferred by Plaintiff and class members on TeamHealth were not conferred officiously or gratuitously. Rather, the conferral of the benefits in the form of the systematic overpayments relevant hereto was induced and solicited due to the inequitable, unlawful, fraudulent, misleading and unfair and deceptive misconduct of the Defendants as is more specifically alleged hereinabove.

178. As is more specifically alleged hereinabove, during the pertinent times, the Defendants intentionally took actions which were meant to and which did solicit and induce the Plaintiff and similarly situated class members to incur the expenses (i.e., the overpayments) that Plaintiff now seeks to recover through the instant claim on its own behalf and on behalf of the putative class.

179. Retention of these conferred benefits by TeamHealth without adequate compensation would be unjust and inequitable under the circumstances, because the amount of the

payment materially exceeded the value of the service for which the billing was sent, namely, provision of medical services to Plaintiff's and class members' enrollees. Under the circumstances, it would be unfair for the Defendant to retain the benefit without the contributor, that is, the Plaintiff, and similarly situated class members, being repaid or compensated by way of recoupment, repayment and disgorgement of the overpayments.

180. Plaintiff and similarly situated class members are not in contractual privity with TeamHealth. There are therefore no means for Plaintiff or class members to secure contractual recovery of the benefits they have conferred on TeamHealth. There is no contract between the Plaintiff or any similarly situated class member and any of the Defendants.

181. In addition or in the alternative, under the circumstances and as was induced by Defendants' systematic above-alleged scheme, which actively concealed material facts, the Plaintiff and similarly situated class members paid TeamHealth's overcharges by mistake when payment was not due. Accordingly, they are entitled as well to restitution on this basis.[37]

182. In addition or in the alternative, under the circumstances and as a result of Defendants' systematic above-alleged scheme, Plaintiff and class members made transfers of funds to Defendants that were induced by fraud or material misrepresentation which are subject to rescission and restitution. Defendants as the transferees are liable in restitution as necessary to avoid unjust enrichment. The subject transfers were induced by fraud and are void because the Plaintiff and class members as transferors had neither knowledge of, nor reasonable opportunity to learn, the character of the resulting transfer or its essential terms.[38]

---

[37] Restatement of the Law 3d, Restitution and Unjust Enrichment, § 6 ("Payment by mistake gives the payor a claim in restitution against the recipient to the extent payment was not due.").

[38] Restatement of the Law 3d, Restitution and Unjust Enrichment, § 13 ("(1) A transfer induced by fraud or material misrepresentation is subject to rescission and restitution. The transferee is liable in restitution as necessary to avoid unjust enrichment. (2) A transfer induced by fraud is void if the transferor had neither knowledge of, nor reasonable

50

183.    Under the circumstances, Plaintiff and similarly situated class members are without an adequate remedy at law, and therefore are entitled to this equitable remedy.

184.    For the reasons stated above, both Plaintiff, and all similarly situated class members, are entitled to equitable remedies including disgorgement and restitution[39] as a result of TeamHealth's unjust enrichment.

## COUNT IV
## DECLARATORY JUDGMENT

185.    Plaintiff incorporates by reference the allegations in each of the preceding paragraphs 1 through 184 as if fully set forth herein.

186.    This claim is brought under the Declaratory Judgment Act, 28 U.S.C. § 2201. Alternatively it is pled as a remedy.  *See* Fed R. Civ. P. 8(a)(3).

187.    Under 28 U.S.C. § 2201(a), any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

188.    Under 28 U.S.C. § 2202, further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

189.    Here, there is a real and present controversy between the parties with regard to Defendants' above-alleged practice of systematically and wrongfully overbilling and overcharging the Plaintiff and similarly situated class members for certain ED medical services.

---

opportunity to learn, the character of the resulting transfer or its essential terms. Otherwise the transferee obtains voidable title.").

[39] Restatement of the Law 3d, Restitution and Unjust Enrichment, § 49(1) ("A claimant entitled to restitution may obtain a judgment for money in the amount of the defendant's unjust enrichment.").

51

190. Defendants have engaged in a scheme to defraud the Plaintiff into paying sums in excess of what was owed by systematically and fraudulently upcoding claims, as discussed above. TeamHealth's practices are deceptive, unfair and unlawful.

191. Plaintiff requests that the Court declare the respective rights and obligations of the parties, declare that the Defendants' above-alleged practices are unlawful, and find that the Plaintiff and class members are accordingly entitled to imposition of remedies including but not limited to an accounting, restitution and disgorgement of any and all overpayments improperly obtained by Defendants, at any time since the first commencement of their overbilling scheme.

192. Plaintiff and class members are entitled to declaratory and injunctive relief to prevent the collection of overcharges based on Defendant's systematic practice of charging inflated amounts for services provided to ED patients.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial of all issues properly triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

1. Certify the matter as a class action, appoint Plaintiff as the class representative and appoint the undersigned counsel to be class co-counsel herein;

2. Enter judgment in favor of Plaintiff and the class on all counts of this Complaint;

3. Award Plaintiff and class members actual consequential, nominal, and all other recoverable monetary damages, in an amount to be proven at trial, of at least $5,000,000, including but not limited to any applicable award of treble damages pursuant to RICO, 18 U.S.C. § 1965(c), or as otherwise permitted by law;

4. Award Plaintiff and class members restitution and disgorgement for unjust enrichment;

5. Enter a declaratory judgment in favor of the Plaintiff and class members and against the Defendants and award and order remedies including an accounting, restitution and disgorgement;

6. Enter equitable and injunctive relief requiring TeamHealth to alter its current policies regarding upcoding, retrain its coding staff to properly code medical claims rather than systematically upcode medical claims, and submit to a regular audit of its coding practices by an independent monitor, with all costs to be paid by TeamHealth;

7. Award Plaintiff and class members their costs, expenses, and reasonable attorneys' fees incurred in this action to the extent permitted by law;

8. Award Plaintiffs and class members all pre- and post-judgment interest to the maximum extent permitted by law; and

9. Award such other relief as this Court deems just and proper.

Dated: February 20, 2023.

/s/ Olivia Smith
Mona L. Wallace (N.C. Bar No. 09021)*
John S. Hughes (N.C. Bar No. 22126)*
Olivia Smith (N.C. Bar No. 58375)*
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
mwallace@wallacegraham.com
jhughes@wallacegraham.com
osmith@wallacegraham.com

Mary Parker #06016
Parker & Crofford
5115 Maryland Way
Brentwood, TN 37027
615-244-2445 Tel
615-255-6037 Fax
mparker@parker-crofford.com

Janet Varnell, Esq.*
Florida Bar No. 0071072
VARNELL AND WARWICK, P.A.
1101 E. Cumberland Ave.
Suite 201H, #105
Tampa FL 33602
Tel.: (352) 753-8600
jvarnell@vandwlaw.com

Robert N. Hunter, Jr.*
Higgins Benjamin, PLLC
301 N Elm St Suite 800
Greensboro, NC 27401
Phone: (336) 275-7577
rnhunterjr@greensborolaw.com

*admitted pro hac vice.

*Attorneys for Plaintiff*

54

## CERTIFICATE OF SERVICE

I hereby certify under Rule 5 of the Federal Rules of Civil Procedure that a true and exact copy of the foregoing First Amended Complaint was served on the following counsel of record via operation of the Court's electronic filing system:

Gary C. Shockley
Caldwell G. Collins
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
1600 West End Avenue, Suite 2000
Nashville, Tennessee 37203
gshockley@bakerdonelson.com
cacollins@bakerdonelson.com

Nora A. Koffman
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
602 Sevier Street, Suite 300
Johnson City, TN 37604
nkoffman@bakerdonelson.com

Matthew S. Mulqueen
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
165 Madison Avenue, Suite 2000
Memphis, TN 38103
mmulqueen@bakerdonelson.com


Dated:  February 20, 2023.

/s/ Olivia Smith
Mona L. Wallace (N.C. Bar No. 09021)*
John S. Hughes (N.C. Bar No. 22126)*
Olivia Smith (N.C. Bar No. 58375)*
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
mwallace@wallacegraham.com
jhughes@wallacegraham.com
osmith@wallacegraham.com

55