UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| BUNCOMBE COUNTY, NORTH CAROLINA and CITY OF PLAQUEMINE, individually and on behalf of those similarly situated, | ) ) ) ) ) | |
| | ) | 3:22-CV-00420-DCLC-DCP |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| TEAM HEALTH HOLDINGS, INC., AMERITEAM SERVICES, LLC, and HCFS HEALTH CARE FINANCIAL SERVICES, LLC, | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In these consolidated putative class actions, Plaintiffs Buncombe County ("the County") and City of Plaquemine ("the City") (together, "Plaintiffs") assert claims for unjust enrichment and civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. In a general sense, Plaintiffs allege that Defendants sent bills for emergency room ("ER") services to third party administrators ("TPAs") and other payors that were inflated due to upcoding, *i.e.*, assigning a Current Procedural Terminology ("CPT") code at a higher level than what the patient's medical chart supported. The Court consolidated both cases for purposes of discovery relative to class certification under Fed.R.Civ.P. 23 ("pre-certification discovery") [*See* Doc. 63]. Now, the County moves to compel the production of certain discovery responses from Defendants [Doc. 82]. As directed, the parties conferred and filed a status report reflecting the outstanding discovery disputes requiring judicial resolution. Additionally, the parties presented oral argument on their respective positions. Thus, the motion is ripe for review.

1

I.      BACKGROUND

Defendants Team Health Holdings, Inc. ("Team Health Holdings"), Ameriteam Services, LLC ("Ameriteam"), and HCFS Health Care Financial Services, LLC ("HCFS") (collectively, "TeamHealth"), in relevant part, provide emergency department ("ED") "staffing and administrative services through a network of subsidiaries, affiliates, and nominally independent entities and contractors" [Doc. 30, ¶ 25]. Specifically, "TeamHealth and its affiliated medical groups contract with numerous hospitals to replace local ED practice groups with TeamHealth's outsourced staff and attendant administrative, operational, coding and billing infrastructure" [*Id*. at ¶ 31]. After TeamHealth's ED staff provide services to a patient, they submit medical records to a central administrative group, *i.e.*, HCFS [*Id*. at ¶¶ 34, 48]. The administrative group "generates a health insurance claim by reviewing [the] medical record . . . and assigning a CPT billing code for the services provided" [*Id*. at ¶ 34]. The claim is sent to the applicable payor, which could be an insurer, a TPA of a self-funded plan, or the patient [*Id*.]. Payments are remitted directly to TeamHealth, which then pays the ED staff a fixed hourly rate or a "per patient fee" [*Id*. at ¶ 35].

Through the foregoing structure, the County alleges that TeamHealth "submit[s] upcoded health insurance claims to payors" and "keep[s] the difference between the amount received . . . and the amount that would have been received had the claim been properly coded" [*Id*. at ¶ 134]. The County further contends that TeamHealth "insulate[s] its activities" by billing payors under the name of the TeamHealth affiliate rather than its own name [*Id*. at ¶¶ 8, 49, 143, 144].[1] The County and other payors have "used their cohort of claims data to engage in statistical analysis and elucidate the systematic nature of the overbilling" [*Id*. at ¶¶ 2, 53].

---

[1]     "TeamHealth's numerous provider groups staffing hospitals across the nation [are split up] into over 200 ostensibly separate and independent local practice entities" which are each "seemingly disconnected from the others, going by many different names" [Doc. 30, ¶ 6].

A statistical analysis of ED visits billed by TeamHealth providers for the County's plan members demonstrates a distribution of the assignment of CPT codes which is "heavily skewed towards higher level codes" [*Id*. at ¶ 86]. For instance, in 2021, TeamHealth providers billed 60% of the visits as CPT code 99285 ("level 5"), which is "only meant to be used for serious, life-threatening conditions requiring high levels of medical decision making by the medical professional[,]" but comparable ED providers billed only 39% of the members' visits as level 5 [*Id*. at ¶¶ 78, 80]. Similarly, in 2019, TeamHealth billed 63% of members' ED visits as level 5, while other providers billed 40% of the members' visits at level 5 [*Id*. at ¶ 88]. According to the County, the distribution of the assignment of CPT codes from level 1 to level 5 should follow a normal bell-shaped curve [*Id*. at ¶ 85]. The County further alleges that "[t]he degree and consistency of TeamHealth's upcoding of claims utilizing CPT code 99285 demonstrates that TeamHealth used a uniform policy or practice of upcoding such claims" [*Id*. at ¶ 81].

Based on the foregoing, the County initiated this action "to recover damages and disgorgement reflecting the wrongful overbilling and to seek declaratory and injunctive relief, on behalf of itself and a putative class of others similarly situated" [*Id*. at ¶ 10]. Thereafter, the City initiated a similar putative class action, *City of Plaquemine v. Risk Management, Inc., et al.*, 3:23-CV-00111, and the Court consolidated the two cases for the purpose of pre-certification discovery [Doc. 63]. From July 8, 2024 to November 4, 2024, the County served TeamHealth with four different requests for production of documents and electronically stored information ("ESI") pursuant to Rule 34 [*See* Docs. 84-3, 84-4, 84-5]. TeamHealth produced numerous documents and a substantial volume of data but objected to a handful of the requests [Doc. 88, pg. 6]. Now, the County seeks to compel production of ESI, contracts, prior testimony, and other documents which it claims to be critical to proving the requirements for Rule 23 class certification [Doc. 83].

3

## II.   ANALYSIS

"The general principals of discovery apply to pre-certification discovery," *Peters v. Credit Prot. Ass'n LP*, No. 2:13-CV-767, 2014 WL 6687146, at *5 (S.D. Ohio Nov. 26, 2014), and "[t]he scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad." *Lewis v. ACB Bus. Serv., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998). Generally, a party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed.R.Civ.P. 26(b)(1). At the pre-certification stage, "discovery should be broad enough to give plaintiffs a realistic opportunity to satisfy the Rule 23 requirements, but narrow enough to prevent defendants from being unduly burdened by discovery that is irrelevant, privileged, or confidential." *Firneno v. Nationwide Mktg. Servs., Inc.*, No. 14-CV-10104, 2016 WL 11582360, at *2 (E.D. Mich. Mar. 24, 2016) (citing *Nash v. City of Oakwood*, 90 F.R.D. 633, 636 (S.D. Ohio 1981)).

Rule 23 requirements are twofold. First, under Rule 23(a), a plaintiff must demonstrate the following: "'(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.'" *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013) (quoting Fed.R.Civ.P. 23(a)). Additionally, "the proposed class must also meet at least one of the three requirements listed in Rule 23(b)." *Id*. In relevant part, Rule 23(b)(3) requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members and that the class action is superior to other available methods to adjudicate the controversy fairly and efficiently." *Id*. at 850–51 (internal quotations omitted).

Here, the County seeks to compel the production of (1) nationwide claims data; (2) contracts with TPAs, insurers, or payors; (3) documents reflecting prior similar claims of upcoding for ER services; (4) testimony and expert reports from prior lawsuits; (5) the sampling protocol referenced in *United Healthcare Services, Inc., et al. v. Team Health Holdings, Inc., et al.*, 3:21-CV-364 (E.D. Tenn.) [Doc. 84-1]. The County asserts that each of the foregoing requests are relevant to its ability to establish commonality, typicality, predominance, and other Rule 23 requirements [Doc. 83, pg. 2]. Each of the requests are examined in turn.

### A. Nationwide Claims Data

TeamHealth, namely HCFS, "maintains claims data associated with primary and secondary Financial Status Classifications ("FSCs") in its IDX billing system" [Doc. 96-1, ¶ 3]. "The FSCs are designations for the entities that HCFS sends claims to and receives payments from" [*Id*.]. TeamHealth produced data reflecting every non-governmental FSC that received or paid a claim for ER services between January 1, 2018 and March 31, 2024 ("FSC spreadsheet") [*Id*. at ¶ 4]. TeamHealth also produced detailed transactional data for claims sent to or paid by Plaintiffs. Now, the County requests production of nationwide claims data, *i.e.*, transactional data for every ER claim paid by any of the FSCs included on the FSC spreadsheet during the relevant time period. TeamHealth asserts that the request is overly broad, unduly burdensome, and disproportionate to the needs of pre-certification discovery [Doc. 88, pgs. 9, 10].

As an initial matter, the requested data is neither overly broad nor disproportionate to the needs of the case. Although the request is broad in that it seeks transactional data on a nationwide basis, it is limited in time to claims during the relevant period, *i.e.*, after January 1, 2018, and in scope to only those claims paid by non-governmental FSCs where ER CPT codes (9928x) were billed. Thus, in light of the class allegations in this matter, the request is not *overly* broad. The

5

data is also proportional to the requirements for class certification. Based upon a review of its own transactional data, the County believes that the nationwide data will demonstrate whether the upcoding was systematic, whether it can satisfy the commonality and predominance requirements, and whether it can establish a reasonable and reliable damages methodology. In support, the County offers the declaration of Rena Conti, Ph.D., an expert in health policy and health economics [Doc. 97-1]. Dr. Conti states that, without nationwide data, it would be "impossible to establish whether [TeamHealth's] billing practices followed consistent patterns across regions, payors, or facilities" and the requested data is "necessary to analyze whether or not [TeamHealth's] alleged upcoding practices were systemic and pervasive across the class" [*Id*. at ¶¶ 14, 15]. To be sure, the patterns and nature of TeamHealth's billing practices are directly relevant to establishing the Rule 23 requirements of numerosity, commonality, typicality, and predominance.

As for the burden on TeamHealth, it is axiomatic that transactional data on a nationwide basis for claims spanning a six-year period will be voluminous. "HCFS issues millions of claims for [ER] services to non-public payors each year" and "[e]ach claim typically includes numerous transactional-level events . . . which must be reflected in a separate line of data" [Doc. 96-1, ¶ 5]. The nationwide data requested by the County "would likely run hundreds of millions—if not over one billion—lines" [*Id*. at ¶ 6]. Nonetheless, TeamHealth has failed to show that the data is "not reasonably accessible because of undue burden or cost." Fed.R.Civ.P. 26(b)(2)(B). TeamHealth admits that it possesses the requested data. And TeamHealth has expressly represented that its emergency medicine services "operate on a uniform billing system using a state of the art billing and accounts receivable software package with *comprehensive reporting capabilities*." Team Health Holdings, Inc., Form 10-K for the fiscal year ended December 31, 2015, *available at* https://www.sec.gov/Archives/edgar/data/1082754/000108275416000054/tmh-201510k.htm.

Moreover, Dr. Conti provides that "modern database systems are specifically designed to store, retrieve, and process large transactional claims datasets" and "there is nothing particularly burdensome about producing the requested claims data" [Doc. 97-1, ¶ 9]. Thus, the County's request for nationwide claims data is not unduly burdensome. Considering the requested data is relevant to the County's ability to satisfy the Rule 23 requirements and would not unduly burden TeamHealth, the County's motion is **GRANTED** to the extent it seeks to compel production of nationwide claims data.

B.     **Contracts with TPAs, Insurers, or Other Payors**

The County also requests production of documents sufficient to identify all in-network and out-of-network FSCs and all agreements between TeamHealth or its affiliated entities and any FSC for network participation or in-network status [Doc. 84-1, ¶ 3]. The County, however, represented that production of the nationwide claims data would obviate the need for the requested contracts. Given the foregoing ruling compelling production of the nationwide claims data, the County's request regarding contracts with payors is **DENIED WITHOUT PREJUDICE**.

C.     **Documents Reflecting Prior Similar Claims of Upcoding for ER Services**

Next, the County requests production of documents reflecting prior similar claims of upcoding for ER services during the relevant time period, including lawsuits, complaints, arbitration, mediation, other alternative disputes resolution claims, audits, special investigations unit investigation, email, letter, refusal to pay, phone complaints, or other proceedings [Doc. 84-1, ¶ 4]. TeamHealth agrees to produce a list of claims in public litigation but argues that the remaining information sought is not relevant to class certification and is protected from disclosure [Doc. 88, pg. 21]. The County takes the position that if TeamHealth is going to use previously resolved upcoding claims to refute the predominance requirement for class certification, then it

7

should have access to the universe of those prior claims. However, the County also recognizes that the national claims data may reveal prior settlements and obviate the need for the instant request. Thus, the motion is **DENIED WITHOUT PREJUDICE**. To the extent the national claims data does not reflect prior similar claims of upcoding, the County may renew the request.

### D. Testimony and Expert Reports from Prior Lawsuits

The County requests production of documents reflecting prior testimony of key persons with knowledge identified by TeamHealth and in prior similar cases, along with expert materials from those cases [Doc. 84-1, ¶ 5]. Specifically, the County requests production of past deposition testimony, written affidavits or declarations, live testimony transcripts, expert reports from certain individuals relating to ER coding or billing [*Id.*]. The County asserts that the requested materials are sought to demonstrate a common pattern of conduct and the uniform failure of TeamHealth's internal audit systems to prevent upcoding—which is relevant to commonality, typicality, and predominance [Doc. 83, pg. 22]. At this stage of the litigation, however, the County has failed to demonstrate how the requested information is proportional to the needs of the case. The County has presented no reason why it cannot obtain the requested information, which would be more narrowly tailored to the instant matter, by deposing the individuals itself. Accordingly, the County's motion is **DENIED** to the extent it seeks production of testimony and expert reports from prior lawsuits.

### E. *United* Sampling Protocol

Finally, the County requests production of the sampling protocol referenced in *United Healthcare Services, Inc., et al. v. Team Health Holdings, Inc., et al.*, 3:21-CV-364 (E.D. Tenn.) [Doc. 84-1, ¶ 6]. The County asserts that the methodology used to sample claims in *United* is relevant to the assessment of similar data that offers class-wide proof of damages in the instant

8

Case 3:22-cv-00420-DCLC-DCP   Document 109   Filed 03/10/25   Page 8 of 9
PageID #: 2977

matter [Doc. 83, pg. 24]. As TeamHealth points out, however, the sampling plan in *United* is unilateral—it has not been agreed upon by both parties [Doc. 88, pg. 30]. Moreover, the sampling plan is only useful and relevant to the specific claims in that case and would be useless when applied to the claims in the instant matter. Accordingly, the requested sampling plan is not relevant to County's damages methodology in this case, and the County's motion is **DENIED** to the extent it requests to compel production of the sampling plan.

### III. CONCLUSION

Accordingly, for the reasons stated herein, the County's motion to compel [Doc. 82] is **GRANTED IN PART** and **DENIED IN PART**. It is further **ORDERED** that the status conference currently set for March 19, 2025 [*See* Doc. 103] is **CONTINUED** to **April 24, 2025, at 10:00 a.m. EST**.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge